**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Erie County Medical Center Corporation, *individually and on behalf of all others similarly situated*, <br><br> Plaintiff, <br><br> vs. <br><br> MultiPlan, Inc., Health Care Service Corporation, Aetna, Inc., Elevance Health, Inc., Centene Corporation, The Cigna Group, UnitedHealth Group, Inc., Humana, Inc., and Kaiser Foundation Health Plan, Inc., <br><br> Defendants. | Case No. <br><br> CLASS ACTION COMPLAINT <br><br> *Jury Trial Demanded* |

1.      Over the course of several years, MultiPlan conspired with the nation's leading commercial healthcare insurance providers to fix, suppress, and stabilize the reimbursement rates that the insurers pay to healthcare providers for out-of-network healthcare services in the United States.

2.      MultiPlan's commercial insurance provider co-conspirators knowingly and purposefully used shared "repricing" tools sold and promoted by MultiPlan, enabling and facilitating an anticompetitive scheme that caused Plaintiffs to receive artificially suppressed reimbursements for out-of-network healthcare services they provided from July 1, 2017 to the present (the "Class Period").

3.      Plaintiff Erie County Medical Center Corporation ("ECMC") brings this Class Action Complaint individually and on behalf of a class of all others similarly situated (collectively, "Plaintiffs") against Defendants, upon personal knowledge of the facts pertaining

to itself, upon information and belief as to all others, and upon the investigation conducted by its counsel.

## **BACKGROUND**

4.     ECMC is a public benefit corporation that manages a healthcare system providing many levels of health services to patients in Western New York. ECMC operates an advanced academic medical center, including a Level 1 Adult Trauma Center, as well as many other specialized centers. ECMC also offers primary care, long-term care, and specialty outpatient services.

5.     ECMC and Plaintiffs provide some healthcare services on an "in network" basis. This means that Plaintiffs have agreements with specific commercial healthcare payors[1] ("Payors") where the Payor pays Plaintiffs a negotiated price of the healthcare services a patient receives, except for any copayment or coinsurance owed by the patient under the terms of their healthcare plan.

6.     Plaintiffs also provide many healthcare services on an "out-of-network" basis, where Plaintiffs do not have an agreement with a given commercial healthcare Payor to accept the commercial healthcare Payor's negotiated rates.

7.     Emergency healthcare is frequently provided by Plaintiffs on an out-of-network basis. The urgency or severity of a medical situation often brings patients to Plaintiffs' facilities regardless of whether in- or out-of-network. Indeed, Plaintiffs have a legal obligation to provide emergency care in many situations and cannot decline to provide these services on the basis of a patient being out-of-network. Vital—often life-saving—care is provided as efficiently as

---

[1] A healthcare "Payor," "Plan," or "Network" refers to any payor of commercial health insurance claims, including health maintenance organizations ("HMOs"), preferred provider organizations ("PPOs"), third party administrators ("TPAs"), leased networks, and "narrow" networks, unless otherwise specified. All Defendants are healthcare Payors.

possible in these situations.

8.     There is often considerable expense incurred when Plaintiffs provide emergency medical care, whether that care is for victims of heart attacks, car wrecks, or any other medical condition.

9.     In situations where Payors do not pay the full cost owed to Plaintiffs for healthcare services, Plaintiffs are not always able to bill those costs to patients.[2] In those circumstances, ECMC and Plaintiffs are dependent on the amount of reimbursements from Payors.

10.     Competitive reimbursements by Payors are also important for non-emergency medical care provided on an out-of-network basis. Important non-emergency healthcare services, including mental health and substance abuse treatment, are frequently offered by Plaintiffs on an out-of-network basis.

11.     For ECMC and Plaintiffs, a substantial amount of hospital revenue is made through commercial insurance reimbursements. Hospitals, particularly those that serve rural communities, struggle to cover their rising costs and keep their doors open to the community members who need their services when there is not adequate reimbursement for their services. Simply put, a robust competitive reimbursement system "is a matter of survival."[3]

12.     Traditionally, Payors competed to reimburse healthcare providers for out-of-

---

[2] The federal No Surprises Act, which took effect on January 1, 2022, prohibits "balance billing" and charging patients more than in-network costs for emergency healthcare services. Even after this law took effect, healthcare payors have continued to try to minimize reimbursement rates on claims for out-of-network services covered by the law. In fact, MultiPlan advertises that it can still "reprice" these claims using its out-of-network claim repricing tools, such as Data iSight.

[3] Brief of the American Hospital Association as Amicus Curiae in Response to Defendant MultiPlan, Inc.'s Motion to Dismiss, *Adventist Health Sys. Sunbelt Healthcare Corp. v. MultiPlan, Inc.*, No. 1:23cv7031 (S.D.N.Y. Jan. 10, 2024), ECF No. 72 (hereinafter "AHA Amicus Br.").

network services at "usual and customary" rates (also known as "usual, reasonable, and customary" or "reasonable and customary"). The "usual and customary" rate was determined independently by Payors relying on independent benchmarking databases that aggregated historical information to provide estimates of fair and consistent reimbursement rates.

13.     Payors have also historically competed on the basis of reimbursement rates to ensure healthcare providers would continue to provide out-of-network services to their insurance customers in non-emergency scenarios, where providers could choose to decline to provide care.

14.     Payors disliked this competitive system—describing it as a "pain point" and "major area of concern"—because the cost of providing competitive reimbursements ate into the Payors' ever-increasing profits.

### A.     MultiPlan's Role as a Healthcare Payor

15.     MultiPlan is one of the healthcare Payors that felt the "pain" of paying competitive reimbursements to out-of-network healthcare providers.

16.     MultiPlan competes with many other health insurance companies, operating many nationwide PPOs in direct competition with the Non-MultiPlan Defendants, such as UnitedHealth and Cigna. MultiPlan, as a healthcare Payor, negotiates the reimbursement rates for providers in its network.

17.     Starting in the mid-2000s, MultiPlan made a series of purchases of companies that had worked to develop tools to "reprice" reimbursements of out-of-network claims.

18.     "Repricing" in this context means the intentional and artificial reduction of reimbursement rates paid to Plaintiffs. MultiPlan's "repricing" tools  were developed to create artificial models that suppressed reimbursement rates, pushing the rates far lower than traditional competitive rates, and significantly lower than the reasonable rates charged by healthcare

providers.

19.     However, MultiPlan could not effectively use these repricing tools on its own. If no other insurance company used these algorithms to suppress reimbursements, then providers would simply refuse to treat patients covered by MultiPlan's PPO where possible.

20.     MultiPlan therefore began recruiting its direct competitors to be its co-conspirators.

21.     MultiPlan advertised the repricing tools as an "out-of-network cost containment" or "cost management" solution at marketing events, including at meetings at luxury resorts and road shows. At these events, MultiPlan's executives met with competitors' executives to tout the tools' effectiveness in suppressing reimbursement rates and workshopped ways to suppress rates even further.

22.     MultiPlan even distributed secret white papers to its competitors to describe how MultiPlan's repricing tools were effective at suppressing out-of-network reimbursement rates.

23.     MultiPlan also directly benefits in another way from its competitors adopting its repricing tools. MultiPlan takes a percentage cut of the "savings" of its competitors—i.e., the difference between the bill for out-of-network services and the artificially suppressed reimbursement amount—as a fee for use its repricing tools.

24.     MultiPlan boasts that its repricing tools generate billions of dollars annually in these so-called "savings" by forcing providers to accept 61-81% underpayments on their out-of-network reimbursement claims. MultiPlan's co-conspirators then in turn pay a 5-7% fee to MultiPlan for using the repricing tools, although the fee has reached 9.75%.

25.     MultiPlan massively profits from this strategy, along with the co-conspirator insurance companies. MultiPlan and its co-conspirators charge their customers an even higher

percentage of the "savings"—as high as 35%—as a "processing fee." The more the Defendants suppress payments to providers, the more revenue they generate.

26.     This is not the first time healthcare Payors seeking to suppress out-of-network reimbursement rates by using similar "repricing" tools. A 2008 investigation by the New York Attorney General uncovered that UnitedHealth, Aetna, and Cigna used repricing tools and services offered by a subsidiary of UnitedHealth Group called Ingenix to suppress reimbursement rates.

27.     The New York Attorney General's investigation uncovered that the competing health insurers had shared detailed out-of-network claim information with Ingenix so it could calculate out-of-network reimbursement rates. The use of Ingenix's data resulted in claim underpayments of 10%- 28%. The investigation resulted in class action litigation and hundreds of millions of dollars in settlements both with private plaintiffs and the government. The insurers also agreed to cease using Ingenix and contribute toward the creation of FAIR Health. a new, independent database to store aggregated claim information. Under the terms of their agreement with the New York Attorney General's office, they had to use FAIR Health for five years.

28.     In 2014, after the five-year term from the New York AG's office expired, MultiPlan ramped up its conspiracy recruitment efforts, and by mid-2017, all major health insurance Payors in the United States had joined the conspiracy and were using MultiPlan's repricing tools to suppress out-of-network reimbursements. The conspiracy reached the critical mass necessary to have its desired effects once UnitedHealthcare, the largest health insurance company in the United States, joined the conspiracy on July 1, 2017.

29.     The scope of MultiPlan's conspiracy generates investments in and profits for the company. For example, in a 2023 investor presentation, MultiPlan highlighted that its payor

customers include "all of the top 15 insurers."

**B.     The Mechanics of MultiPlan's Conspiracy**

30.     Here is how the conspiracy works: Defendants agree to provide MultiPlan with real-time, confidential, and detailed claims data that MultiPlan, in its words, "ingest[s]"—i.e., combines in a database used by its repricing tools, which include MultiPlan's principal repricing tool, Data iSight, and Viant, Pro Pricer, and MARS. Or, as MultiPlan puts it, it becomes "deeply integrated into the proprietary claims adjudication system of its customers" and then uses all these proprietary data sources to "drive" its analytics system. Defendants further agree to submit healthcare providers' out-of-network reimbursement claims to MultiPlan. MultiPlan's repricing tools and algorithms then use the information in the database—Defendants' proprietary claims data—to generate a reimbursement rate far lower—"ridiculously low" and "crazy low" in the words of former MultiPlan employees—than the rate generated by using the traditional "usual and customary" method. Defendants commit to using MultiPlan's repricing method and tools and having MultiPlan send the artificially suppressed reimbursement rates to providers like Plaintiffs. MultiPlan demands that the providers accept the repriced claim in mere days, even hours, or risk even further reduction in the reimbursement rate. MultiPlan also has forbidden the providers from seeking additional reimbursement from any other source, giving them no way to mitigate their damages. Once the providers have capitulated to these coercive tactics, MultiPlan collects its fee for acting as, to use the words of one analyst, "a mafia enforcer for insurers."

31.     The conspiracy proceeds apace—and generates billions in revenue for its members—because the widespread use of MultiPlan's repricing tools, particularly among the biggest health insurers, gives Plaintiffs no realistic option other than accepting these artificially suppressed reimbursement rates. The sheer volume of reimbursement claims makes it

impracticable for Plaintiffs to negotiate with MultiPlan. And even if they had the time and resources for negotiations, MultiPlan would benefit from knowing that it repriced the claims as part of a nationwide conspiracy with its largest competitors, giving the providers nowhere to turn for relief. Moreover, some Defendants have instructed MultiPlan to make its claims processed with MultiPlan's repricing tools non-negotiable. MultiPlan brags that, by forcing Plaintiffs into this bind, they successfully impose these artificially suppressed, unsustainable rates on providers 99.4% of the time. It has successfully replaced the traditional "reasonable and customary" model with its anticompetitive repricing tools.

32.     Defendants' price-fixing conspiracy has massively affected the healthcare economy. By 2022, MultiPlan used its repricing tools to fix prices on 370,000 out-of-network claims daily for over 700 payors, resulting in underpayments of $22 billion annually to providers. In 2023, underpayments rose to $22.9 billion. The conspiracy continued even through the once-in-a-century national health crisis caused by the COVID-19 pandemic. While Plaintiffs suffered financially while struggling to provide lifesaving care to patients during the COVID lockdowns, Defendants benefitted by bilking providers out of billions in revenue for the services they provide. That dichotomy continues to this day.

33.     Here, there is direct evidence of Defendants' conspiracy. In investor presentations and Securities and Exchange Commission ("SEC") filings, MultiPlan acknowledges that its customers include the largest health insurance providers—i.e., the Non-MultiPlan Defendants. Likewise, the Non-MultiPlan Defendants disclose that they use MultiPlan's repricing tools to set the reimbursement rate for out-of-pocket healthcare services. Moreover, MultiPlan facilitated meetings between insurance executives so they could discuss using MultiPlan to suppress out-of-network reimbursements rates. Plus, at least one Defendant, UnitedHealth Group, admits to

outsourcing its reimbursement rate pricing to MultiPlan to bring its reimbursement rates in line with its competitors. Importantly, MultiPlan makes clear that it combines the private, real-time claims data of *all* its customers to generate its reimbursement rates. Thus, Defendants knew that when they provided their private, real-time claims data, their competitors would do the same, and all that private data would factor into the reimbursement rate suggested by MultiPlan.

34.     This direct evidence, by itself, suffices to prove the antitrust violation. Nevertheless, compelling circumstantial evidence—Defendants' parallel conduct coupled with plus factors that render the market susceptible to collusion—yields the same conclusion.

35.     There is substantial evidence of (a) motive to conspire, (b) actions against interest, and (c) traditional conspiracy evidence. First, Defendants had the motive to conspire given the market's structural features and the "concern" and "pain" generated by the traditional, competitive usual and customary reimbursement methodology. Second, abandoning that methodology would have been against Defendants' self-interest had they not conspired to fix reimbursement rates. Third, various forms of traditional conspiracy evidence tend to demonstrate price-fixing: radically changing the methodology for setting out-of-network reimbursement rates; providing and exchanging real-time, confidential claims data to and with MultiPlan; opportunities for Defendants to conspire, including at events hosted by MultiPlan; prior industry collusion on payment of out-of-network claims by some of the same Defendants here that was the subject of a government investigation, litigation, court findings that the collusion could have violated antitrust law, and hundreds of millions of dollars in settlements; and Defendants' knowing adoption of a common course of action, namely outsourcing the pricing of out-of-network reimbursement claims to MultiPlan.

36.     As set forth below, Defendants' scheme violates federal antitrust law in multiple

ways. First, although MultiPlan and the Non-MultiPlan Defendants compete horizontally as healthcare payors, they agreed with one another to artificially suppress reimbursement rates paid to healthcare providers for out-of-network services. This facially anticompetitive horizontal agreement restrains trade and is a per se violation of Section 1 of the Sherman Antitrust Act.

37.     Even if MultiPlan and the Non-MultiPlan Defendants did not or could not potentially compete as healthcare payors, they have nonetheless engaged in a horizontal hub-and-spoke conspiracy to fix the price of out-of-network reimbursement claims. Under this scenario, MultiPlan (the hub) entered into agreements with the Non-MultiPlan Defendants and other co-conspirators (the spokes), which had the intent and effect of outsourcing decisions on pricing out-of-network reimbursement claims to a single common entity, MultiPlan (the hub). Moreover, the Non-MultiPlan Defendants and other co-conspirators did so while knowing that one another were doing the same thing and for the same purpose (the rim). This facially anticompetitive conduct is a per se violation of Section 1 of the Sherman Antitrust Act. Even if Defendants' conduct somehow benefitted competition and furthered consumer welfare in some minimal way (it does not), the conspiracy's anticompetitive effects would vastly outweigh any benefits to Plaintiffs and should thus also be swiftly condemned under the Rule of Reason.

38.     Finally, the Defendants' agreements to use MultiPlan's repricing tools to set reimbursement rates on out-of-network claims violates Section 1 of the Sherman Antitrust Act because those agreements unreasonably restrain trade and have anticompetitive effects throughout the market for reimbursements for out-of-network healthcare services while providing no countervailing procompetitive benefits.

39.     These violations of the antitrust laws have caused Plaintiffs to suffer massive economic losses as they have received and continue to receive artificially suppressed

reimbursement rates on out-of-network reimbursement claims. As MultiPlan brags, Plaintiffs receive these artificially suppressed reimbursement rates on 98-99% of the out-of-network reimbursement claims, underscoring the vast scope of Plaintiffs' injuries and the conspiracy's impact.

40.     Plaintiffs would have received fair and competitive reimbursements for their out-of-network healthcare services in the absence of Defendants' conspiracy. The antitrust laws aim to prevent injuries that stem from a conspiracy to systematically suppress the price paid for a good or service, such as out-of-network healthcare services.

41.     Plaintiffs bring this action to recover all damages and other relief necessary and proper under federal antitrust law.

## PARTIES

### A.     Plaintiff

42.     Plaintiff Erie County Medical Center Corporation ("ECMC") is a state public benefit  corporation operating a healthcare system that includes an advanced medical center with 573 inpatient beds, an adult trauma center, a regional center for burn care, behavioral health services, other specialized inpatient medical centers, on- and off-campus primary care, various outpatient specialty care centers, and a long-term care facility. It maintains its principal place of business in Buffalo, New York. ECMC provides out-of-network healthcare services at all its locations. It has had out-of-network claims repriced by Defendants during the Class Period, including within the four years preceding the filing of this Complaint.

### B.     Defendants

43.     **MultiPlan and Its Related Corporate Entities.** Unless otherwise specified, this Complaint refers to MultiPlan, Inc., MultiPlan Corporation, Churchill Capital Corporation III,

Viant Holdings, Inc., Viant Payment Systems, Inc., National Care Network, LP, and National Care Network, LLC, collectively as "MultiPlan."

44.     Defendant MultiPlan, Inc., is a New York corporation with its principal place of business at 115 Fifth Avenue, 7th Floor, New York, New York 10003.

45.     MultiPlan Corporation, a publicly traded company, is the parent company of MultiPlan, Inc., and the various entities that carry out MultiPlan's operations.

46.     MultiPlan Corporation was previously known as Churchill Capital Corporation III ("Churchill Capital"). Churchill Capital was incorporated in Delaware and formed for the purpose of operating as a SPAC, i.e., a special-purpose acquisition company, to take MultiPlan Inc., public. Churchill Capital changed its name to MultiPlan Corporation after its acquisition of MultiPlan, Inc. in October 2020. After MultiPlan went public, the private equity firm Hellman & Friedman and the Saudi Arabian sovereign wealth fund became two of its largest shareholders.

47.     MultiPlan acquired Viant Holdings, Inc., a healthcare cost management company, in 2010.

48.     In 2011, MultiPlan acquired National Care Network, LLC.

49.     **Health Care Service Corporation ("HCSC")**, a Mutual Legal Reserve Company headquartered in Illinois, is the parent company, or otherwise affiliated or related company, to many commercial health insurance and prescription drug plans that operate in the United States. HCSC is an independent licensee of the Blue Cross and Blue Shield Association (BCBSA) separately headquartered in Chicago, Illinois. HCSC does business in the State of Illinois as Blue Cross and Blue Shield of Illinois (BCBSIL). The various HCSC and BCBSA plans issue insurance or provide administrative services concerning healthcare claims in the form of (a) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3)

hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

50. **Aetna, Inc.**, a subsidiary of CVS Health Corporation, is a Delaware corporation headquartered in Connecticut. Aetna has a commercial insurance network that pays in- and out-of-network healthcare claims from healthcare providers in all 50 states and Washington, D.C. Aetna is the parent company, or otherwise affiliated or related company, to many commercial health insurance and prescription drug plans operating in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (a) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

51. **Elevance Health, Inc.**, formerly known as Anthem, Inc., an Indiana corporation headquartered in Indiana, includes many Blue Cross Blue Shield plans. Elevance offers health insurance plans in California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin. Elevance is the parent company, or otherwise affiliated or related company, to many commercial health insurance and prescription drug plans operating in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (a) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

52. **Centene Corporation**, a Delaware corporation headquartered in Missouri, is the parent company, or otherwise affiliated or related company, to many commercial health insurance and prescription drug plans operating in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (a) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) Medicare

Advantage plans, and (4) Medicaid plans.

53.     **The Cigna Group**, a Delaware corporation headquartered in Connecticut, is the parent company, or otherwise affiliated or related company, to many commercial health insurance and prescription drug plans operating in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (a) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

54.     **UnitedHealth Group, Inc.**, a vertically integrated Delaware corporation headquartered in Minnesota, consists of two divisions, UnitedHealthcare and Optum. UnitedHealthcare, the largest commercial health insurance company in the United States, provides health benefit plans. Optum provides other health services. UnitedHealth Group has various wholly owned subsidiaries, including UnitedHealthcare, which pays in- and out-of-network claims from healthcare providers in every state and the District of Columbia. UnitedHealth Group's insurance plans issue insurance or provide administrative services concerning healthcare claims in the form of (a) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

55.     **Humana, Inc.**, a Delaware corporation headquartered in Kentucky, is the parent company, or otherwise affiliated or related company, to many commercial health insurance and prescription drug plans operating in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (a) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

56.     **Kaiser Foundation Health Plan, Inc.** ("KFHP") is a California corporation headquartered in California. KFHP is the parent company, or otherwise is an affiliated or related company, to many commercial health insurance and prescription drug plans operating in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) Medicare Advantage plans, and (4) Medicaid plans.

57.     Aetna, Elevance, Centene, Cigna, HCSC, UnitedHealth Group, Humana, and KFHP have all entered into an out-of-network repricing agreement with MultiPlan, participated in the conspiracy, and performed acts and made statements in furtherance of the conspiracy.

### C.     Co-Conspirators

58.     Co-conspirators in the scheme include any person or entity who has entered into an out-of-network repricing agreement with MultiPlan, used MultiPlan's out-of-network claim repricing tools to process claims for out-of-network healthcare services, or otherwise participated with Defendants in the alleged anticompetitive conduct and have performed and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for all acts or omissions of the co-conspirators.

### JURISDICTION & VENUE

59.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises out of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 3, and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26.

60.     This Court also has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a proposed class action in which: (1)

there are at least 100 Class members; (2) the combined claims of Class members exceed $5,000,000, exclusive of interests and costs; and (3) Defendants and at least one Class member are domiciled in different states.

61.     Venue is proper in this District pursuant to Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

62.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22  and Illinois's long-arm statute, 735 Ill. Comp. Stat. 5/2-209(a).  Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in Illinois, including by offering health insurance plans in the state; sending confidential, proprietary claims data concerning claims for out-of-network healthcare services provided in Illinois to MultiPlan for use in MultiPlan's database; using MultiPlan and its claim repricing tools to reprice, pay, and negotiate reimbursements for out-of-network commercial health insurance claims arising from out-of-network healthcare services provided in Illinois.

## FACTUAL ALLEGATIONS

### A.     All Defendants Compete Directly As Insurance Companies.

63.     Defendants operate multiple nationwide networks of "preferred" healthcare providers, known as Preferred Provider Organization ("PPO") networks. To create these PPOs, Defendants recruit healthcare providers, negotiate reimbursement rates with them, and set quality and credentialing expectations for them. Then, Defendants sell access to their PPO networks as part of a health insurance plan. Subscribers to insurance plans with PPOs can access any healthcare

provider in the PPO's network ("in-network providers") at a reduced rate, but typically pay a greater portion of a healthcare provider's fee if they choose a provider who does not belong to their insurer's PPO network ("out-of-network providers").

64.     For example, Defendant Aetna offers the Aetna Open Choice PPO plans. Defendant Elevance, Defendant HCSC, and other Blue Cross Blue Shield entities offer Blue Choice PPO plans. Defendant UnitedHealth offers UnitedHealthcare Options PPO Plans. Defendant Centene offers its PPO plans through its Ambetter Health product. Defendant Cigna offers the Cigna PPO Network. Finally, Defendant Humana offers Medicare Advantage PPO Plans.

65.     MultiPlan describes itself "as a leading independent national" PPO. Indeed, in 2023, MultiPlan advertised that it owns and operates "the largest independent, nationwide primary" PPO in the United States, called the PHCS Network, which includes "more than one million health care providers nationwide: 920,000 practitioners, 4,800 acute care hospitals and 87,000 ancillary facilities." A primary PPO network like PHCS serves as the network of healthcare providers for health insurance companies and other payors of commercial health insurance claims that lack "their own direct contractual discount arrangements with providers."

66.     In addition to its nationwide primary PPO network, PHCS Network, MultiPlan offers regional PPO networks. For example, its HealthEOS and HealthEOS Plus Networks serve Wisconsin, Michigan, Minnesota, and Illinois. Beech Street Network is MultiPlan's regional PPO network that serves Alaska, Nevada, and Utah. And MultiPlan's AMN/HMN/RAN Network serves Arizona and Hawaii. MultiPlan also markets three complementary PPO networks—MultiPlan Network, Beech Street Network, and IHP Network—through which competing healthcare payors, after purchasing access, may expand their rosters of in-network providers.

67. Various entities subscribe to MultiPlan's primary PPO Network, including provider- sponsored and independent health plans, union health plans, and TPAs. And many other entities subscribe to MultiPlan's complementary PPO networks, including "large commercial insurers, property and casualty carriers via their bill review vendors, Taft-Hartley plans, provider-sponsored and independent health plans, and some TPAs."

68. MultiPlan profits by selling access to its multitudinous PPO networks to competing insurance companies and other healthcare payors, including the Non-MultiPlan Defendants.

69. MultiPlan's PPO networks compete with other commercial health insurance payors, including the Non-MultiPlan Defendants, to contract with healthcare providers and expand the size of their respective networks. In fact, MultiPlan admits that it competes directly with the PPO networks offered by the Non-MultiPlan Defendants to entice healthcare providers to join their respective networks. In its Annual Report filed with the SEC on February 29, 2024, MultiPlan stated that, when providing its "network-based services" it competes "directly with other independent PPO networks," including "with PPO networks owned by our large Payor customers." It made similar statements in its Annual Reports from 2021 through 2023.

**B.    The Importance of Out-of-Network Services.**

70. According to the Kaiser Family Foundation's 2023 survey of employees, PPOs are the most common type of employer-provided healthcare plan, covering almost half of all covered employees in the United States.

71. PPOs are desirable in large part for their flexibility: "[u]nlike an HMO, a PPO offers [insureds] the freedom to receive care from any provider—in or out of [] network." In other words, PPOs enable their subscribers to see any out-of-network doctors or specialists at any

hospital they may require. Not only does this make finding care easier by way of expanding the selection pool, but it also enables insureds to select the doctor they want in the location they want and at the time they need them.

72.     The ability to access out-of-network services is also important because, "[s]ometimes, where you get healthcare—or who provides it—is out of your control." For example, an insured may need emergency care and therefore choose the most accessible provider without a thought as to whether they are in or out of their insurer's PPO network. Or an insured may "have a unique medical condition and the services are not available from in-network providers."

73.     Likewise, consumers may need to seek out-of-network healthcare to access mental health or substance abuse treatment. For instance, one California woman could only find an out-of-network provider to provide treatment for her son's opioid addiction, even though she had her employer's most expensive health insurance plan.

74.     Out-of-network availability is also important in instances where in-network services "are not available as soon as you need them" or when your primary care physician "determines that a non-network provider can best provide the service."

75.     Despite recognizing the many benefits of out-of-network services, Defendants encourage their insureds to "[s]ave money by staying in network."

### C.     Relevant Product Market

76.     The relevant product market for purposes of Plaintiffs' claims, assuming a relevant antitrust market need be defined, is the market for reimbursements paid by commercial insurers to healthcare providers for out-of-network medical services (the "Reimbursement Market"). Within this market, there are submarkets for reimbursements paid by each specific commercial insurer (or other payor) for the out-of-network medical services provided to their

insureds. In this market and its submarkets, healthcare providers like Plaintiffs function as sellers of out-of-network medical services, while commercial insurers like Defendants function as buyers of those services.

**D. Relevant Geographic Market**

77.     The relevant geographic market for purposes of Plaintiffs' claims, assuming a relevant antitrust market need be defined, is the United States.

78.     Medical providers in the United States cannot reasonably turn to payors in other countries—where private medical insurance is uncommon or non-existent and nearly all medical care is administered as part of a comprehensive government program—to be reimbursed of out-of-network medical services. The healthcare industry in the United States, including the market for reimbursement of out-of-network services, is universally recognized by industry participants as distinct from healthcare industries in foreign countries and is subject to a variety of unique federal and state laws and regulations that apply only in the United States.

79.     The relevant geographic market is not smaller than the United States because healthcare providers can practicably and do turn to commercial insurers located in other parts of the country for reimbursement of out-of-network services. Healthcare providers can choose to file claims on behalf of their out-of-network patient and are not bound by the patient's contract with his or her health insurer.

**E. The Out-of-Network Reimbursement Market Traditionally Operated Through Independent Decision-Making.**

80.     Before the at-issue conspiracy began, each Defendant made independent decisions about how much it would pay for out-of-network medical services. At that time, they each had a competitive incentive to pay reasonable reimbursement amounts to ensure their out-of-network healthcare providers would continue to provide services to their insureds in non-emergency

scenarios. Increasingly, however, Defendants began viewing their obligation to pay for their subscribers' out-of-network services as a "pain point" and "major area of concern" cutting into their still exorbitant profits.

### F. Defendants Attempted and Failed to Change the Traditional Reimbursement Methods.

81. Defendants employed various tactics to change the reimbursement method with an aim toward increasing their already large profits by decreasing the amount they would reimburse for out-of-network care. These tactics included UnitedHealth and other Defendants' pre-2009 use of tools like those now at issue aimed at underpaying reimbursements for out-of-network care. The New York Attorney General responded to these payors' efforts by implementing a publicly available healthcare claims database to promote reimbursement transparency. But this solution was short lived.

82. In 2008, the New York Attorney General began a year-long investigation of UnitedHealth Group, Inc.'s subsidiary, Ingenix, a data company that created schedules to help its users— including UnitedHealth, Aetna, and Cigna—determine their reimbursement rates for out-of-network care.

83. The Attorney General's investigation revealed that competing health insurers were sharing detailed information on their out-of-network claims with Ingenix for it to calculate out-of-network reimbursement rates for commercial health insurers. Ingenix's database, according to the investigation, resulted in out-of-network claims being underpaid by 10% to 28% depending on the service involved, which increased costs for consumers.

84. On January 14, 2009, UnitedHealth settled with the New York Attorney General, agreeing to shut down the Ingenix database and contribute $50 million toward the creation of a new, independent database that would house more aggregated information. This new database

became known as FAIR Health.

85.     Other commercial health insurers, including Cigna and Aetna, entered similar settlement agreements with the New York Attorney General. On January 15, 2009, Aetna agreed to end its relationship with Ingenix and pay $20 million toward FAIR Health's development. Similarly, on February 18, 2009, WellPoint, Inc. agreed to stop using Ingenix and contribute $10 million toward the creation of FAIR Health.

86.     UnitedHealth's Ingenix scheme also led to class action litigation and class-wide settlements. For example, UnitedHealth paid $350 million to settle a class action. As part of its settlement agreement, UnitedHealth agreed to use the FAIR Health database for a five-year period of time. Once that limited period lapsed, however, it joined the other Defendants in the MultiPlan scheme.

87.     FAIR Health was created as part of an effort to provide transparency regarding health insurance to both consumers and practitioners. It collects healthcare claim records from health insurers around the country—more than 2 billion claims in total—that it includes in its database. FAIR Health makes the results of its efforts available to consumers, researchers, businesses, and more.

88.     Before MultiPlan and its analytical tools came on the scene, FAIR Health was widely used throughout the commercial health insurance industry for pricing out-of-network reimbursements. But commercial payors—including UnitedHealthcare, Cigna, and Aetna—were only required to use FAIR Health for five years under their agreements with the New York Attorney General's office. When these terms expired in 2014, MultiPlan pounced.

**G.     MultiPlan Acquired, Developed, and Disseminated Tools to Carry Out the Conspiracy.**

89.     Around 2006, MultiPlan embarked on a new effort to evolve into "MultiPlan 2.0,"

which aimed to acquire companies with analytic tools that are purportedly designed to reprice out-of-network claims submitted by healthcare providers. In actuality, these tools are designed to go beyond repricing to calculate a reimbursement amount for out-of-network services that is both far less than what the insurance company would otherwise pay and far less than the healthcare provider's claim for reimbursement.

90.     MultiPlan 2.0 was effective to say the least. MultiPlan touted its success in aggregating "an incomparable database of claims, charge, and provider credentials." MultiPlan credits its "highly disciplined management team" for its "proven track record of successfully integrating acquired businesses both operationally and culturally."

91.     This new and improved MultiPlan 2.0 was a result of the acquisitions of numerous businesses and their analytical tools. For example, in 2011, it acquired National Care Network ("NCN") to form the basis of MultiPlan's analytics business by way of its iSight repricing tool. Then, in 2014, MultiPlan "acquired Medical Audit & Review Solutions . . . to enter the payment integrity market."

92.     Earlier, in 2009, MultiPlan acquired Viant from Welsh, Caron, Anderson & Stower. United States antitrust regulators expressed concerns regarding this acquisition, which led the Department of Justice's Antitrust Division to open an investigation and issue a "second request" for several categories of detailed information concerning the transaction.

93.     The efficacy of MultiPlan's tools is driven by the deep technological connections between MultiPlan and its competitors, including the Non-MultiPlan Defendants. Under their agreements with Multiplan, the Non-MultiPlan Defendants and other competitors send their claims to MultiPlan by way of an electronic data interchange. The claims MultiPlan receives include detailed information such as the procedure code, dates of service, the billed amount, and an

alphanumeric code indicating whether the claim is subject to an insurance network's previously disclosed reasonable and customary out-of-network rates.

94.     The electronic data interchange stores these claims in MultiPlan's "Claims Savings Engine," known internally as FRED. Pursuant to the contracts between MultiPlan and the Non- MultiPlan Defendants, FRED reroutes the claim to one of MultiPlan's several proprietary algorithms, including Data iSight, Viant, Pro Pricer, and MARS. These algorithms apply the agreed-on claims suppression methodology to each claim to determine how little MultiPlan, the Non-MultiPlan Defendants, and other insurance competitors can offer a healthcare provider for the good or service in question and still have that offer accepted.

95.     The exact methodology behind MultiPlan's claims suppression tools is non-public and proprietary. MultiPlan maintains internal white papers that describe the relevant pricing processes that its tools use for out-of-network claims. Apart from this currently unobtainable information, MultiPlan's United States patent (U.S. Patent No. 8,103,522) filed by its subsidiary, National Care Network, LLC, sheds light on some of its repricing mechanisms.

96.     However, a United States patent (U.S. Patent No. 8,103,522) filed by MultiPlan's subsidiary National Care Network, LLC, explains that when MultiPlan receives an out-of-network claim, it groups that claim into a refined diagnosis related group ("rDRG"), a standardized method of grouping insurance claims used by Medicare and some commercial health insurance networks that categorizes medical services on the basis of severity and complexity. Then, MultiPlan identifies all claims at similar hospitals for the same rDRG code. Next, MultiPlan attempts to estimate the hospital's cost of providing that rDRG-coded service based on that group of hospitals' cost report submissions to the U.S. Centers for Medicare and Medicaid and the wage index of the hospital submitting the out-of-network claim. Next, MultiPlan calculates the markup and margin

for each submitted rDRG-coded out-of-network claim using the following equation: ((Average

Charge) - (Average Cost) / (Average Cost)) x 100.

97.     To illustrate how MultiPlan's repricing tools work, consider this simplified

example: A person insured through one of MultiPlan's competitors receives emergency services

from ECMC. If ECMC does not have a pre-existing contract with the insurer that governs the

cost of these emergency services, under state insurance regulations, the insurer is still required to

pay for the services rendered. Knowing this, and under its legal obligations, ECMC treats the

patient, then submits a claim to the patient's insurer detailing ECMC's charges. But, instead of

simply paying ECMC's claim itself, the insurer turns the claim over to MultiPlan. MultiPlan then

runs the claim through its analytic tools to "reprice" the claim pursuant to the agreement between

MultiPlan and the insurer. After its tools have run their course, MultiPlan contacts ECMC

directly with the repriced claim, offering a take-it-or-leave-it partial payment for ECMC's

original claim. If ECMC does not accept MultiPlan's repriced amount, the best it can hope to

recover from negotiations with MultiPlan is still a substantial underpayment of its submitted

claims.

98.     This same scenario plays out in a non-emergency context. An individual may

decide to receive care from an ECMC-employed health care provider for another reason—e.g.,

her appointments are available sooner or she has a certain specialization the individual needs—

even though that healthcare provider is out-of-network. Because this is a non-emergency setting, ECMC

has no legal obligation to treat that patient. Nevertheless, ECMC may decide to provide treatment based

on the understanding that the patient has health insurance and that ECMC will recoup at least some costs of

treatment from the insurer on an out-of-network basis. ECMC then provides the treatment and bills the

insurance company. And once again, rather than paying after receiving the claim, the insurance company

sends the claim to MultiPlan. MultiPlan then reprices the claim using its agreed-upon formula. And just as

in the emergency scenario, MultiPlan itself presents the all-or-nothing repriced offer to ECMC on the insurer's behalf.

99.     MultiPlan's executive officers explained how their repricing tools work and what makes them "unique" in an August 2020 presentation to investment analysts. First, MultiPlan "ingest[s] data from [its] customers" by "integrat[ing] its systems "quickly and easily" with their customers systems. "[T]his data is in the form of a claim." MultiPlan then "store[s] and move[s] this claim across our platform to our various products, algorithms and intelligence engine" "to develop solutions" to its customers' problems, such as "out-of-network claims" that were "the biggest pain point for our customers." MultiPlan does all of this in "real-time." As a result, MultiPlan is "deeply embedded in their [customers'] claims adjudication process." This "deep integration into" their customers systems gives MultiPlan "far better data sets" than their competitors.

100.    When asked whether MultiPlan "own[s] full rights to 12 petabytes of data you capture," Paul Galant, the Operating Partner of Churchill Capital Corp III, which became MultiPlan Corporation, could not give an unequivocal, "yes." Instead, he said that "the dataset that comes into us . . . is owned by us for the purpose of generating those savings." In fact, he characterized MultiPlan as merely "stewards of" their clients' data, making clear that its customers still retain ownership interest in their data and merely transfer it for use—along with their competitors' data—in MultiPlan's repricing tools.

101.    Galant further noted that MultiPlan minimizes "the risk . . . of [its] clients internalizing [its] solution set" by combining *all* its customers' private, real-time data into its repricing tools. He explained:

> we see data across 700 payers. That data is much, much larger and more
> diverse than what any single payer has within their system          And
> so that is a massively important point of differentiation. We build our

26

> algorithms on a much larger data lake. And because we do that, we believe our products generate bigger savings, whether it's payment integrity or analytics.

102.    Thus, MultiPlan acknowledges that its repricing tools rely on the real-time, proprietary claims data from *all* its customers to reprice out-of-network claims. In other words, when repricing a customers' out-of-network health services claim, MultiPlan does not simply rely on *that* customers' private, real-time, claims data because the customer could replicate that functionality. Rather, MultiPlan differentiates its claims repricing tools by using a "much larger and more diverse. . . data lake" than "what any single payer has within their system" or could hope to learn let alone "digest" on its own, i.e., the proprietary, real-time claims data from *all their customers' competitors.*

103.    Galant further explained that centralizing claims suppression with MultiPlan makes sense for all the conspirators because "if a payer decides to do everything on their own," then "[t]heir ability to go back to providers, and push for saving is fundamentally different than ours. We are the third-party independent source. The gold standard, if you will, of that data that we capture and analyze. And so we can talk to the entire industry, we don't have to talk to any one specific payer when we do that. And so just from a political or practical, any way you want to slice it, we are a much better mechanism by which payers can reduce the cost of healthcare versus doing it themselves." Put differently, MultiPlan can more aggressively "push for savings"—or coerce healthcare providers—because it has data from all a payor's competitors and knows that the payor's proposed reimbursement rate aligns with its competitors' due to the conspiracy. This knowledge makes MultiPlan a much more effective "mafia enforcer for insurers," and its coconspirators know it.

104.    Multiplan benefits from its claims repricing tools by charging its horizontal

competitors a fee for using its services. This fee is based on the difference between a healthcare provider's original claim and the amount the provider accepts following MultiPlan's repricing of the claim. It is usually equal to 5–7% of the "savings," but has been as high as 9.75%. This fee scheme incentivizes MultiPlan to recommend the lowest reimbursement price possible: doing so increases the fee MultiPlan charges to the competing insurers. The less money an insurer ultimately pays to healthcare providers, the more money MultiPlan makes.

105.    And just as MultiPlan benefits from this conspiracy, so do the Non-MultiPlan Defendants. By agreeing to suspend competition with respect to the reimbursement of out-of-network claims, MultiPlan and the Non-MultiPlan Defendants are able to artificially underpay those claims, inflating the profits of their PPO insurance businesses.

106.    MultiPlan's reach is extensive—it touts that it "extends to more than 100,000 health plans covering more than 60 million people." The agreement between Defendants to fix prices leave healthcare providers no alternative but to accept the curbed MultiPlan repricing offers. Because Defendants have agreed not to compete with one another, the only question in these negotiations is how much the healthcare provider will be harmed by Defendants.

**H.      The Conspiracy's Existence, Agreement, and Coordination.**

107.    Despite effectively carrying out its "MultiPlan 2.0" efforts to acquire analytical tools aimed at decreasing its payments for out-of-network healthcare services, MultiPlan had more work to do. It knew that if it was the only insurance company using these tools, many out-of-network healthcare providers would stop treating MultiPlan's patients, and Multiplan's efforts would have been made in vain.

**a.      Direct Evidence of Agreement**

108.    There is direct evidence that Defendants have agreed to curb out-of-network

reimbursement payments, including (1) express contracts between MultiPlan and the Non-MultiPlan Defendants setting forth the collusive conduct at issue; (2) Defendants' public statements and communications admitting to the existence of these contracts and their knowledge of each non-MultiPlan Defendant's participation in the same scheme; (3) internal communications between Defendants that were revealed in other litigation; and (4) MultiPlan's U.S. patent that explicitly references Defendants' intention to utilize a methodology to suppress out-of-network reimbursements to healthcare providers.

### 1. Contracts with Payors

109. MultiPlan has contracts with nearly every healthcare payor in the United States—over 700 payors in total. Almost all of those contracts include agreements to use one of MultiPlan's repricing tools to curb payments on out-of-network healthcare claims and to split the revenue generated by this underpayment between MultiPlan and the healthcare payor. Despite the contracting entities' efforts to keep these agreements confidential, many facts surrounding them are publicly known.

110. Commercial insurance payors admit they have agreements with MultiPlan to reprice out-of-network claims. For example, UnitedHealth states that healthcare providers may be offered a "rate recommended by Viant, an independent third-party vendor that collect and maintains a database of health insurance claims for facilities, then applies proprietary logic to arrive at a recommended rate."

111. Upon information and belief, MultiPlan has entered into additional contracts with many competing commercial health insurance companies that require MultiPlan's competitors to use its out-of-network claims suppression technology.

### 2. Public Statements and Communications

112. In communications with healthcare providers and the public, Defendants have admitted to the existence of their agreements to suppress out-of-network reimbursement claims.

113. Numerous healthcare providers promote that they have "contracted with" MultiPlan's PPO network.

114. More healthcare providers have gone so far as to file claims against MultiPlan-related entities. For example, Jeffrey Farkas, M.D., LLC submitted a claim for $332,300 to Great-West Healthcare d/b/a Cigna Corp. for out-of-network services performed on February 17, 2016. Farkas received a response via fax not from Cigna but from Multiplan, which revealed that "Great-West Healthcare, now part of CIGNA, has contracted with MultiPlan to facilitate resolution of the above referenced services due to the Provider being out-of-network for this claim. This agreement may expedite payment and decrease the Patient's responsibility." MultiPlan offered Farkas only $12,407 as reimbursement for the out-of-network services performed—a difference of $319,893 from Farkas' claim. Multiplan continued: "By signing this agreement, Provider accepts this Proposed Amount and agrees to reduce the liability of the Patient and Payor. Provider agrees not to bill the Patient, or financially responsible party, for the difference between the Billed Charges and the Proposed Amount." MultiPlan imposed a two-day deadline for Farkas to decide whether to accept its offer.

### 3. Communications Among Defendants

115. MultiPlan's communications with the Non-MultiPlan Defendants are further direct evidence of the existing agreement.

116. Defendants have also created new "industry partnerships" that give them additional opportunities to privately discuss increasing the conspiracy's ruthless efficiency. For

instance, in a 2020 presentation, MultiPlan's Chief Information Officer, Michael Kim, touted the founding of the Synaptic Blockchain Alliance[4] alongside United Optum, Humana, and Aetna. He explained that leveraging blockchain technology would "significantly reduce our provider data management costs" and "improve the quality of our data." The Alliance's website further explains that the organization is "a provider data exchange—a cooperatively owned, synchronized distributed ledger to collect and share changes to provider data," which "is now a shared resource of more than two million records collectively managed by payers, providers, and data suppliers."

### 4.    Patent

117.    MultiPlan obtained a U.S. patent that describes its repricing methodology. It explains that Defendants are explicitly agreeing on the methodology that will be used to calculate and diminish out-of-network reimbursement payments. The patent shows MultiPlan agrees with its customers, the Non-MultiPlan Defendants (i.e., competing healthcare payors) on the methodology or calculation that MultiPlan's repricing tool will use to curb reimbursement payments to healthcare providers.

### b.    Circumstantial Evidence of Agreement

118.    Although Plaintiffs' citations of extensive direct evidence of the conspiracy obviate the need to show any circumstantial evidence, there is plenty of circumstantial evidence to further support the existence of the cartel.

### 1.    Parallel Conduct

119.    Defendants engaged in parallel conduct in numerous ways by collectively agreeing

---

[4] Based on its homepage, it appears that the organization refers to itself as the Synaptic Health Alliance and considers only MultiPlan, Humana, and UnitedHealth Group as founders. *Homepage*, Synaptic Health Alliance (Mar. 28, 2024, 4:28 PM), https://www.synaptichealthalliance.com/.

to diminish the amount they would pay to healthcare providers for out-of-network claims and, in a continuous, parallel manner, sent repricing notices and curbed payments to healthcare providers pursuant to their agreements.

120.    Defendants carried out a parallel shift from the traditional out-of-network reimbursement process to the new MultiPlan model. In the former, commercial insurance providers competed with one another to offer out-of-network healthcare providers usual, customary, and reasonable ("UCR") reimbursement payments. But part of Defendants' parallel shift is aimed at moving away from this traditional model toward generating increased revenue by means of agreements with employer subscriber groups.

121.    These subscriber group agreements are made in administrative services only ("ASO") insurance plans. Under ASO plans, the employer carries the risk of loss in the instance a claim exceeds the premiums. The premiums are paid to the employer and the employer is on the hook for paying its employees' claims. As part of this plan, the employer pays a monthly administrative services fee to an insurance company—a per member, per month ("PMPM") fee—to administer the ASO plan. The insurance company then enters into "shared savings agreements" that permit it to send out-of-network claims for ASO employers to MultiPlan for repricing. Large employers, which make up a substantial portion of the commercial insurance market, are almost all part of ASO insurance plans.

122.    Defendants each added new terms to their ASO contracts in order to ensure they would profit from out-of-network reimbursement diminishment in these scenarios. Now, in addition to the PMPM fees, these ASO plans require self-insured groups to pay a percentage (as high as 35%) on the difference between a billed out-of-network charge and the amount paid on that out-of-network claim, known as the "shared savings fee" or "processing fee." In more

egregious examples of claim suppression, this shared savings fee is higher than the amount paid to the provider for performing the services.

123.    For example, the self-funded insurance plan for San Francisco employees explains it uses UnitedHealth's shared savings program: "Provides discounts to service rates for certain out-of-network health care providers that are not part of UHC's primary PPO network. In return, SFHSS keeps 70% of savings generated, remaining 30% is paid to UHC as program fee."

124.    These shared savings agreements generate tremendous profits for insurance companies and self-funding employers at the expense of medical providers. UnitedHealthcare made approximately $1.3 billion from its shared savings agreements to suppress out-of-network claims in 2020. Moreover, in an internal presentation, UnitedHealth stated it intended to cut its out-of-network reimbursements by $3 billion by 2023.

125.    So, when employers decide to use ASO plans, they must enter into multiple explicit agreements with both health insurers and MultiPlan that cause the suppression out-of-network reimbursement payments to healthcare providers. MultiPlan and its insurance company co-conspirators then split these ill-gotten profits amongst themselves.

126.    MultiPlan organized this parallel shift. Its sales executives repeatedly tout the ability of their repricing tools to create savings by underpaying out-of-network claims. And it promotes savings of 61%–81% off billed charges.

127.    MultiPlan advertises to competing health insurance providers that Data iSight achieves "optimal reimbursement"—i.e., the lower-possible payments to healthcare providers—when "compared to Usual and Customary and Medicare-Based pricing."

128.    Through MultiPlan's coordination efforts, nearly all major insurance companies have implemented "shared savings" strategies, and nearly all major insurance companies use

MultiPlan's tools to implement those services.

129.    The MultiPlan repricing tools also generate parallel repricing offers for every entity that uses them. With the use of these tools, Defendants can offer parallel reimbursement amounts for out-of-network services regardless of the location where the service is offered. This makes no sense absent the existence of a conspiracy. The cost of care is understandably less expensive in rural America than it is in more urban, densely populated cities. Because of this, legitimate methods of claims reimbursement account for differences in cost that arise depending on where the underlying care is administered.

130.    In a competitive market, competing insurance providers would not agree to use the same repricing tool to diminish their out-of-network claims. Typically, health insurance providers would want to increase the likelihood that their insureds would receive treatment from out-of-network healthcare providers by paying reasonable reimbursement rates for their services. And—absent a conspiracy such as the one that exists here—these insurers would not make their decisions to underpay claims automatically but would instead take time to consider the specific circumstances underlying each claim.

131.    When competitors implement the same reimbursement suppressing tools, as they have here, they are able to collectively maximize profits while shielding themselves from the cost of disputes. They are no longer kept in line by the worry that their insureds will not be accepted for optional out-of-network care and can instead blindly and automatically accept lowered claims reimbursement suggestions. The only market players who lose are the providers who are forced into accepting the diminished take-it-or-leave it reimbursement offers.

### 2.    Plus Factors

132.    The Multiplan conspiracy is characterized by at least the following "plus factors":

(1) the high market concentration of conspiracy members; (2) high barriers to entry; (3) ample motive to participate in the conspiracy; (4) a history of prior collusion; (5) numerous opportunities to collude, including those directly facilitated by MultiPlan; (6) actions against self-interest that only make sense as part of a common plan; (7) evidence of conspiracy enforcement mechanisms; (8) pervasive and systematic information exchange between the conspiracy members and MultiPlan; and (9) the existence of customary patterns and courses of dealing that can only be explained by the existence of a conspiracy agreement. Assessed holistically, *see Continental Ore. Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99 (1962), these "plus factors" demonstrate evidence of an unlawful horizontal price-fixing agreement.

133. **High Collective Market Concentration**. The relevant product market for Plaintiffs' claims is the market for reimbursements paid by commercial insurers to healthcare providers for out-of-network medical services. Within the relevant market, there are submarkets for reimbursements paid by each commercial insurer (or payor) for the out-of-network medical services provided to patients enrolled in that insurer's health insurance plan. In this market, healthcare providers like Plaintiffs function as sellers of out-of-network services and commercial insurers like MultiPlan function as buyers of those services.

134. Healthcare providers have no reasonable substitutes for the reimbursements provided by commercial insurers for out-of-network medical services. Under various federal and state laws, it is illegal for healthcare providers to seek reimbursements from insureds for most out-of-network claims. Defendants—who dominate the market—force healthcare providers to forego any reimbursement from insureds as a condition of receiving any compensation at all, no matter how meager, for out-of-network claims.

135. Government sources offer reimbursement payments to healthcare providers, but

none of these sources—including Medicare, Medicaid, and Tricare—compete with commercial health insurance. These government sources service populations that are not typically served by commercial health insurance. For example, both Medicare and Medicaid have statutory age, income, and disability requirements, and Tricare is only available to current and former members of the United States military.

136. For purposes of Plaintiffs' claims, the relevant geographic market is the United States. Medical providers in the United States cannot practicably turn to payors in other countries, where private medical insurance is either uncommon or non-existent. The United States healthcare industry, including the market for reimbursement of out-of-network services, is universally recognized by industry participants as distinct from healthcare industries in foreign countries.

137. Defendants, through their conspiratorial contracts, collectively hold dominant power in the relevant market. Nearly every commercial insurer that participates in the relevant market has agreed with MultiPlan to curb out-of-network reimbursement payments. The members of the MultiPlan conspiracy collectively control at least 90% of the relevant market.

138. MultiPlan faces only limited competition in the out-of-network claims repricing business. MultiPlan claims Data iSight differentiates itself through its patented repricing methodology and its large, proprietary database of historical claims, whereas other claims repricing services base their methodologies on usual and customary rates or Medicare rates.

139. MultiPlan's main competitor, Zelis, along with other claims repricing services, are small-time players compared to MultiPlan. In 2022, Zelis processed approximately 2 million claims for repricing. According to a June 28, 2023 presentation, in 2022, MultiPlan processed 546 million claims, accounting for $155 billion in claims.

140. Defendants' high market concentration is circumstantial evidence of agreements to

conspire. This power has allowed the MultiPlan conspiracy to flourish and impose anticompetitive effects on the entire relevant market.

141.    And healthcare providers have no choice when seeking payment for out-of-network services they provided to a patient. Oftentimes, their only option for reimbursement is submitting a claim to the patient's particular insurance company. If that insurance company is a member of the MultiPlan conspiracy, the healthcare provider has no choice but to seek reimbursement from a MultiPlan repriced claim.

142.    **Barriers to Entry in the United States Commercial Reimbursement Market.** Entering the U.S. Commercial Reimbursement Market is hindered by high barriers. New entrants must be able to bear the extreme expenditures of time and money required to develop a network of healthcare providers large enough to compete as a commercial healthcare insurer. Even without developing an insurance network, there are significant capital outlays required to operate as a commercial healthcare payor. Entrants then face the challenge of contending with the economics of scale that large incumbent insurers possess. Obtaining name recognition in an industry occupied by longstanding and well-recognized major players presents an additional hurdle.

143.    There is also an actuarial risk for new health insurance networks. If they cannot balance claims paid and revenue generated through premiums or network access fees (such as ASO fees), their capital reserves can quickly deplete.

144.    Even if a new entrant to the market experiences initial success, it may not be able to survive long enough to see a return and develop a base of business to allow it to effectively maintain its insureds.

145.    These barriers to entry further cement the dominance of the MultiPlan conspiracy

members by ensuring any entity that tries to enter the market but rejects MultiPlan's price-fixing scheme cannot undermine the conspiracy members' ability to impose repriced reimbursement rates on healthcare providers for out-of-network services.

146.     The repricing services themselves also present a high barrier to entry. To develop a third-party repricing service, a new entrant would need to spend copious amounts of money to develop source code and algorithms that effectively reprice out-of-network claims without infringing MultiPlan's patents, develop contractual relationships with the hundreds of commercial insurance networks, and commit significant resources to consistently improving its repricing algorithms and software. As a result, it is unlikely that any company could effectively disrupt MultiPlan's repricing scheme.

147.     These numerous high barriers effectively prevent new entrants from interrupting MultiPlan's position of control. Therefore, these barriers to entry circumstantially support a conspiracy's existence.

148.     **Motive to Conspire**. Defendants have a pressing financial motive to suppress reimbursement payments for out-of-network service. MultiPlan is paid a percentage of the underpayment to healthcare providers—it only makes money if the conspiracy members are successful in suppressing out-of-network reimbursement payments; the more the conspiracy curbs reimbursements, the more MultiPlan is paid.

149.     Likewise, the Non-MultiPlan Defendants are incentivized to suppress payments to healthcare providers to increase their own profits. Just as MultiPlan charges insurance companies a percentage of the difference between the provider's billed amount and the amount actually paid, insurance companies charge their customers, often employers who provide coverage to employees through self-funded plans administered by the insurance company, a percentage of that same

difference as a "shared savings fee" or "processing fee."

150.    As explained above, these processing fees can result in big revenue for insurance companies and massive expenses for their customers. For instance, a union health plan for about 1,500 Arizona electricians paid $2.6 million in fees to Cigna in 2019. Cigna charged Arlington Count, Virginia, $261,000 in such fees one year.

151.    UnitedHealthcare executives testified that the fees generate about $1 billion annually for the company, which it generates by exploiting its customers, such as New Jersey-based trucking company New England Motor Freight, who it charged $50,650 as a processing fee for one hospital bill. Moreover, when New England Motor Freight questioned the fee, UnitedHealthcare executive William T.  Raha pushed back against the idea of providing a partial refund because of "concern[] about setting precedent" on an issue—charging exorbitant processing fees on gross underpayments of out-of-network healthcare reimbursement claims—that "cuts across not only all of Key Accounts, but National Accounts as well" and the company's "unwilling[ness] to enter into one-off agreements that cap our revenue." Given the revenue generated by these fees, UnitedHealthcare has unsurprisingly encouraged employers to cease using FAIR Health (which charges a flat fee) to determine reimbursement rates and instead use MultiPlan's claim repricing tools.

152.    The following illustration shows how MultiPlan's payor-customers' "incentives are completely aligned" with its own, as MultiPlan itself stated in a presentation to investors: If a doctor bills $1,000 for services but accepts the $500 payment advised by MultiPlan, then a $500 difference exists between the billed amount and the amount actually paid. MultiPlan charges the insurance company a fee for forcing this reduced payment on the provider, generally between 5-7%, or $25-35. Meanwhile, the insurance company charges its customer a processing fee, generally

between 30-35%, or $150-175, for obtaining these "savings." If Defendants can suppress reimbursements even further, then MultiPlan and the insurance companies reap even bigger rewards. If the doctor accepts $200 on the $1,000 bill based on the rate advised by MultiPlan, then MultiPlan and the insurance company take a cut of the $800 difference between the billed amount and amount paid. This results in fees for MultiPlan ranging from $40-56 and $240-280 for the insurance companies.

153. Thus, MultiPlan and the Non-MultiPlan Defendants' motives are aligned because the less they pay to healthcare providers, the more revenue and profits they get to keep for themselves and split pursuant to their anticompetitive agreements.

154. Indeed, sometimes Defendants suppress payments to healthcare providers so much that the fees that MultiPlan and the Non-MultiPlan Defendants charge for these "savings" exceed the amount the provider receives for providing medical care. For instance, when a facility providing outpatient substance abuse treatment received $134.13 on a claim, Cigna, the payor, received $658.75—almost five times as much—as a processing fee. MultiPlan received $167.48— more than the provider—for its role in suppressing the claim. Court records shows this pattern repeats itself frequently. Ultimately, therefore, while Cigna received $4.47 million in processing fees from employers related to addiction treatment claims in California, the providers received only $2.56 million. MultiPlan received $1.22 million for its role in repricing those claims.

155. The Non-MultiPlan Defendants also have a motive to conspire with MultiPlan to avoid the legal issues like those created by their use of Ingenix. For instance, in an internal email, Cigna Chief Risk Officer Eva Borden explained that Cigna "cannot develop these charges internally (think of when Ingenix was sued for creating out-of-network reimbursements)." Instead, it "need[ed] someone (external to Cigna) to develop acceptable" reimbursement rates. MultiPlan

filled this need.

156.    MultiPlan implies its repricing tools create an entirely legal scheme by offering to enter into formal contracts for those services, regardless of the truth that conspiracy agreements of this kind are disincentivized by U.S. law.

157.    **Prior Collusion**. It is easier for competitors in the same market to conspire if they have conspired before. Defendants know one another and know they can trust each other to keep their conspiracy secret.

158.    Because commercial health insurance networks cannot collectively control out-of-network reimbursement rates through legally enforceable contracts (which is the way they traditionally controlled in-network reimbursement rates), they have attempted to enter illegal agreements to curb out-of-network reimbursements on multiple occasions.

159.    As detailed *supra*, the New York Attorney General's investigation of UnitedHealth's subsidiary, Ingenix, revealed a conspiratorial scheme in which competing health insurance providers were sending detailed information on their out-of-network claims to Ingenix to be included in a database that was used to calculate reimbursement rates.

160.    UnitedHealth and its co-conspirators, including Aetna and WellPoint, agreed to cease utilizing Ingenix and paid large sums toward the creation of the unbiased database, FAIR Health.

161.    Opportunities to Collude. Defendants had, and continue to have, ample opportunities to conspire, including through MultiPlan's facilitation of private communications among competing insurance networks.

162.    MultiPlan's road shows provided numerous opportunities for Defendants to conspire. For instance, in 2019, major health insurance executives, including those from the Non-

MultiPlan Defendants, met in Laguna Beach, California. At this gathering, MultiPlan executive Dale White professed that "MultiPlan is Magic" and discussed "a few things up [its] sleeve" that might benefit the insurers.

163.    Defendants also have opportunities to collude by way of their other industry connections. For example, many Defendants are members of industry associations such as AHIP (formerly "America's Health Insurance Plans"). Aetna, Centene, Cigna, Elevance, HCSC, Humana, and many others are members of AHIP.

164.    AHIP provides it "plays an important role in bringing together member companies and facilitating dialogues to advocate on shared interests."

165.    Numerous of Defendants' executives hold positions on AHIP's Board of Directors, including Gail K. Boudreaux, President and CEO of Elevance; David Cordani, Chairman and CEO of Cigna; and Maurice Smith, President, CEO, and Vice Chair of HCSC.

166.    AHIP hosts conferences, committee meetings, and board meetings multiple times a year where its members participate in closed-door meetings.

167.    A federal court in California found that entities' overlapping membership in AHIP and participation in AHIP events presented sufficient opportunities to conspire so as to demonstrate a *per se* horizontal price-fixing agreement.

168.    MultiPlan and industry groups such as AHIP both offer ample opportunities for Defendants to collude regarding the MultiPlan conspiracy.

169.    **Defendants' Acts Against Self-Interest**. Members of the MultiPlan conspiracy have engaged in numerous actions made against their own self-interest.

170.    The agreements between MultiPlan and the Non-MultiPlan Defendants are themselves against the members' self-interest. If a single insurance provider chose to enter into an

agreement with MultiPlan and shift away from the traditional UCR methodology to drastically underpay out-of-network claims, healthcare providers would *en masse* refuse to treat patients subscribing to that provider when possible—*i.e.*, in non-emergency situations. It follows that the health insurance provider would then experience serious diminishment in the value and breadth of their insurance offerings and a quick diminishment in numbers of subscribers. More, it would be less likely to bring healthcare providers in-network, further reducing its network's value and potential earnings.

171. Notably, due to the artificial suppression of out-of-network healthcare reimbursement rates caused by MultiPlan's repricing tools, some healthcare providers have already stopped treating patients with certain healthcare plans. For instance, a rural Virginia provider of behavioral therapy for children with autism now refuses to accept patients with insurance like Aetna because its reliance on MultiPlan's repricing tools resulted in her receiving less than half the Medicaid reimbursement rate for her services. She explained that the artificial suppression of reimbursement rates for out-of-network healthcare services "puts [her] in a tough position" where she must decide whether "to pay [her]self a salary or be able to help people."

172. The single contracting insurance provider would also likely be forced to undergo lengthy and expensive repricing negotiations after facing pushback from providers. But when numerous providers enter a conspiracy to reprice claims, it becomes less effective for healthcare providers to negotiate due to the volume of repriced offers.

173. Defendants have also refrained from engaging in any self-interested behavior that may have risked destabilization of the conspiracy.

174. For example, Defendants and other competitor clients of MultiPlan have abandoned any efforts to keep repricing activities in-house, despite the savings such efforts would result in.

In at least one case, a Defendant has done this despite spending considerable sums developing an alternative claims repricing product.

175.     UnitedHealth is the nation's largest commercial health insurance provider and, as such, could easily analyze its own historical claims database to ascertain the most efficient pricing for out-of-network reimbursements. Bringing its repricing decisions in-house would eliminate MultiPlan as an intermediary, saving UnitedHealth as much as 9.75% on each repriced out-of-network claim, resulting in a savings of hundreds of millions of dollars per year.

176.     In 2021, UnitedHealth created Naviguard, intended to act as an in-house replacement for MultiPlan. With this creation, UnitedHealthcare created a "roadmap" to terminate its contract with MultiPlan in 2023. But the plan was abandoned and MultiPlan decided to renew its contract with MultiPlan in January 2023 instead.

177.     This decision makes no economic sense from UnitedHealth's perspective. UnitedHealth has an economic incentive to compete against other health insurance providers to ensure that UnitedHealth's insureds can see out-of-network healthcare providers—thus, it must pay competitive reimbursement rates as opposed to other insurers. UnitedHealth developed Naviguard with an eye toward accomplishing this competitive edge. Rather than follow through with this self-serving plan, UnitedHealth recommitted itself to participating in the MultiPlan conspiracy by renewing its contract to use MultiPlan's claims repricing tools.

178.     UnitedHealth's development and subsequent abandonment of Naviguard in favor of continuing its relationship with MultiPlan is a clear demonstration of actions against self-interest. It is clear that this is circumstantial evidence of a conspiracy.

179.     **Enforcement Mechanisms**. Members of the MultiPlan conspiracy have not and cannot go to court to enforce the agreements they have entered into, as doing so would raise a red

flag to the agreements' conspiratorial nature. For this reason, MultiPlan conspiracy members are forced to create informal internal structures to enforce the cartel agreement and deflect attempts to disrupt its success.

180.    For example, UnitedHealth's plan to abandon MultiPlan in favor of Naviguard would have inevitably destabilized the MultiPlan agreements and may have caused other payors to reevaluate their participation in the conspiracy.

181.    MultiPlan stepped in with a sweetheart deal. Upon information and belief, in 2022, MultiPlan and UnitedHealth negotiated a new contract for MultiPlan's repricing services in 2023. MultiPlan gave UnitedHealth extremely favorable terms to protect the larger conspiracy.

182.    As a result, MultiPlan experienced a 20.6% drop in revenues between the first quarter of 2022 and the first quarter of 2023. But MultiPlan was willing to sacrifice short-term revenues and profits to stabilize the conspiracy and keep its largest members happy and devoted.

183.    To further sweeten the deal, on June 27, 2023, MultiPlan announced that John Prince, the recently retired President of Optum—UnitedHealth's health services subsidiary—would join MultiPlan's board of directors.

184.    MultiPlan's willingness to sacrifice short-term profits does not make economic sense absent its knowledge that perpetuating its conspiracy will have long-term benefits.

185.    **Information Exchange**. Defendants and similar commercial insurance competitors are unlikely to exchange large volumes of competitively sensitive information in the absence of an agreement ensuring the others would do the same.

186.    But here, MultiPlan, the Non-MultiPlan Defendants, and other competing health insurance companies have agreed to exchange data regarding health care providers' claims, reimbursement offers made in response to those claims, and the actual amount paid on those

45

claims.

187.    Defendants' information exchange is of the type the courts have recognized as likely to have anticompetitive effects. *See, e.g.*, *United States v. U.S. Gypsum Co.*, 438 U.S. 441, n.16 (1978) ("Exchanges of current price information, of course, have the greatest potential for generating anti-competitive effects). Defendants are exchanging real-time pricing data by way of transmitting it automatically to MultiPlan through electronic links. This data is specific to commercial insurance claims. And the data—pricing information updated in real time—is not publicly available. MultiPlan endorses that its analytics-based services are driven by "[p]roprietary and public data sources." Finally, the shared data is granular and unblinded, meaning MultiPlan knows exactly what its competitors are charging for medical services.

188.    MultiPlan is using this proprietary, real-time pricing data to explicitly share confidential pricing information between members of the conspiracy to fix prices. For example, when seeking to establish UnitedHealth's out-of-network reimbursement rates, MultiPlan told UnitedHealth that prices set at 350% of Medicare rates would "be in line with another competitor" and "leading the pack along with another competitor."

189.    Competing companies would not ordinarily risk sharing their real-time, competitively sensitive pricing information with their rivals. More, they would not simultaneously pay those rivals—in this case MultiPlan—millions of dollars absent an agreement to restrain competition. Defendants' information exchange is more consistent with an agreement to restrain trade than with competition on the merits. Therefore, this type of information exchange is circumstantial evidence of a cartel agreement among competitors.

190.    **Pattern and Course of Dealing**. MultiPlan has an established history of forming, maintaining, and stabilizing the conspiracy, notably boasting that it is "deeply embedded into [its

46

co-conspirators'] claims platforms."

191.    MultiPlan emphasizes the long-term nature of its relationships with its claims repricing clients. In a June 28, 2023, investor presentation, it stated that its "Average Length of Large Customer Relationships" was over 25 years.

192.    For over a decade, the leading commercial health insurance providers in the United States Commercial Reimbursement Market have been bound to multi-year contracts to use MultiPlan's claims repricing tools. MultiPlan's consistent public statements trumpeting this high level of market participation and promoting upwards of 90% acceptance rates of its reimbursement offers provide encouragement and reassurance to other members of the conspiracy.

193.    MultiPlan has effectively taken the lead in recruiting new members to its conspiracy, espousing the advantages of collusive pricing to them, warning they will suffer a drastic financial disadvantage if they do not participate in the cartel, and enforcing price discipline by encouraging members to match their competitors' repricing standards.

194.    These customary patterns, formulas, leadership, and other courses of dealing are circumstantial evidence of agreements and a conspiracy to suppress reimbursement rates.

**I.      Defendants Joined and Participated in the Conspiracy.**

195.    The agreements between the New York Attorney General and the insurance providers who were using Ingenix to artificially undervalue reimbursements ensured providers would use an independent database to determine reimbursement rates. But these agreements only required that insurers use the database "to help determined reimbursement rates for a period of at least five years." Thus, when the terms of these agreements expired in 2014, insurers, including Defendants, immediately undertook efforts to get back to the way things were—that is, using repricing tools to undervalue reimbursements.

196. UnitedHealth joined the MultiPlan conspiracy on July 1, 2017, in an effort to "bring[] UnitedHealth back into alignment with its primary competitor groups Blues, Cigna, Aetna on managing out-of-network costs."

### J. The Conspiracy Suppressed Out-of-Network Claim Reimbursement Rates.

197. The involvement of all the major American health insurance companies was a large component of the conspiracy's success. As MultiPlan's Vice President of Health Care Economics Sean Crandell testified in 2021 that MultiPlan's clients include "all of the top 10 insurers in the U.S." Since then, the conspiracy has expanded.

198. In June 2023, MultiPlan told investors that "all of the top 15 insurers" based on market share used its claim repricing tools to artificially suppress the reimbursement rate for out-of-network claims. An investor presentation identified those insurers by name, specifically mentioning United Healthcare, Aetna, Cigna, Humana, HCSC, and Centene.

199. In 2022, the top 15 insurers accounted for 63.69% of the health insurance market, giving the conspiracy members enormous power in the out-of-network reimbursement market and over healthcare providers.

200. MultiPlan brags that, due to this power, healthcare providers accept MultiPlan's artificially suppressed out-of-network reimbursement rates 99.4% of the time based on a 2018 study. More recently, MultiPlan has cited acceptance rates of 99% and 98%. MultiPlan specifically cites these acceptance rates as a "key benefit" of its claim repricing tools when attempting to entice new customers to join the conspiracy.

201. These high acceptance rates do not reflect the validity of MultiPlan's repricing methodology. They arise because the price-fixing agreement between Defendants has snuffed out

competition and left providers, such as Plaintiffs, no choice but to accept the artificially suppressed reimbursement rates.

202. Various factors make it impossible for healthcare providers to successfully resist these artificially suppressed, anticompetitive reimbursement rates. First, due to the conspiracy's size and conspirators' market share, healthcare providers cannot practically turn elsewhere to seek reimbursement for out-of-network claims. They cannot refuse to do business with the conspiracy's members and remain economically viable.

203. Second, healthcare providers cannot meaningfully negotiate with MultiPlan or the Non-MultiPlan Defendants. If a healthcare provider refuses to accept MultiPlan's initial reimbursement rate, then MultiPlan attempts to impose an *even lower* rate on the provider. For example, in one fax to a doctor, MultiPlan gave the doctor only eight days to respond to its cut-rate reimbursement offer. It then threatened that, "[i]f you do not wish to sign the attached proposal, this claim is subject to a payment as low as 110% of Medicare rates based on the guidelines and limits on the plan for this patient." Others have reported deadlines of mere hours. Healthcare practices and their billing specialists say that MultiPlan has followed through on these threats. As one woman in charge of billing for a healthcare provider put it: "It's not a real negotiation." In other words, in its role as a "mafia enforcer for insurers," MultiPlan gives providers an "offer" they cannot refuse—accept the cut-rate reimbursement or watch it cut even further.

204. Refusing to accept MultiPlan's initial reimbursement rate also causes delayed claim payment, placing additional economic pressure on healthcare providers to accept the initial reimbursement rate. Moreover, MultiPlan's employees have refused to answer more than five questions on calls with providers, even as MultiPlan withholds specific details about how its repricing tools work. These tactics foreclose real negotiation.

205. Healthcare providers also cannot negotiate directly with other non-MultiPlan payors, including the Non-MultiPlan Defendants. MultiPlan controls the entire out-of-network claims handling process for these payors—from setting the reimbursement rate and sending it to the provider to "negotiating" any changes to the rate and satisfying the claim. The non-MultiPlan payors have outsourced not only pricing decisions, but also claim collection, to MultiPlan. As explained above, MultiPlan encourages this because it collects real-time, proprietary claims data from all the Non-MultiPlan Defendants and co-conspirators and knows that their proposed reimbursed rates align due to the conspiracy, giving it a greater ability to "push for savings." If a provider's billing department asks an insurer, such as the Non-MultiPlan Defendants, to justify its low-ball reimbursement rate, the insurance company will protest that it has no responsibility for MultiPlan's pricing. At the same time, MultiPlan will refuse to negotiate with providers because it is not the insurer. This charade occasionally, and intentionally, gives providers nobody with whom to negotiate. In fact, in recent years, some payors have taken advantage of MultiPlan's offer to make claims entirely non-negotiable.

206. Third, the sheer number of out-of-network claims to process makes it impracticable for health care providers to negotiate fair reimbursement rates on every out-of-network claim. MultiPlan advertises that it processes 370,000 claims *daily*. Attempting to negotiate the reimbursement rate on all those claims would require substantial investments in time and resources and prevent Plaintiffs from using those resources to improve the quality of and access to care at their facilities.

207. Defendants exploit this limitation. They know that medical billing departments handle droves of out-of-network claims and lack time to fight every individual claim. This emboldens Defendants to impose sub-competitive reimbursement rates on healthcare providers

and give them as few as eight days to accept them.

208. Bureaucratic indifference and perverse incentives exacerbate these problems for providers. As one analyst noted, "MultiPlan's key strategy for forcing doctors to accept low prices is by erecting a bureaucratic layer so thick and complicated that few can navigate it. MultiPlan preys on physicians using subtly forceful [communications], expecting physicians' medical billing staff to not have time to fight through layers of bureaucratic tape." MultiPlan's former employees explain that the company fostered a culture that promoted artificially suppressing reimbursement rates in part by linking employee bonuses to these suppressed rates. Predictably, therefore, MultiPlan, through its employees, would employ harsh negotiation techniques, such as sending reimbursement offers to providers accompanied by "all-caps admonitions." One former negotiator described herself as "a bit of viper," who "wanted to go in as hard as I could because my bonus is affected." Another negotiator admits that she "knew [the artificially suppressed reimbursement rates] were not fair" and would call providers from her cellphone to advise against accepting the artificially suppressed reimbursement.

209. Fourth, even in those rare circumstances when MultiPlan has negotiated with a health insurance payor, the benefits from that negotiation prove fleeting. After the initial negotiation, MultiPlan seeks to stabilize the percentage gap between the provider's bill and the negotiated price the provider accepts. Due to this "stabilization," the provider can only get the negotiated price again by charging the same price for services he charged the first time around, even though the provider and MultiPlan know that negotiations yielded a lower price previously. For example, one provider noted that he typically received $6,000 to $8,000 for a service but had to bill $18,000 to $32,000 to get paid that $6,000 to $8,000 amount from MultiPlan and its affiliated health plans. Building in this inefficiency further discourages negotiations and needlessly raises

healthcare costs.

210. The conspiracy has substantially affected the out-of-network reimbursement market and healthcare providers, such as Plaintiffs. In 2018, MultiPlan told investors that it identified "savings"—underpayments to healthcare providers—for its 700+ customers that totaled $15.6 billion. By 2023, that number approached $23 billion.

211. MultiPlan candidly explained that underpayments come from reducing the money healthcare providers receive for services provided. In a 2021 "roadshow" presentation, MultiPlan compared the payments a doctor would expect to receive with and without MultiPlan involved in the out-of-network reimbursement process. Without MultiPlan, the doctor would receive $800 for the service. With MultiPlan, the doctor receives only $600, or 25% less.

212. This illustration vastly understates the typical underpayments produced by MultiPlan's claim repricing tools, which MultiPlan claims generally fall between "61%-81% off billed charges." For example, UnitedHealthcare, using MultiPlan's services, paid a doctor just $5,449.27 for performing a lengthy, complicated procedure to repair tissue and close a wound on a patient whose incision from heart surgery had failed to heal. This left the patient with a bill exceeding $100,000.

213. In another example, UnitedHealthcare covered only $7,879 of a $152,594 bill, or just more than 5% of the bill.

214. By agreeing to not compete with its competitors on the reimbursement of out-of-network claims, all Defendants benefit. Both MultiPlan and the Non-MultiPlan Defendants pay less to healthcare providers by artificially suppressing the reimbursement rate for out-of-network claims. MultiPlan gets the added benefit of taking a cut of those "savings" from its co-conspirators.

215. While health care providers have struggled due to these underpayments—with

some even declaring bankruptcy because of the reduced reimbursement rates—MultiPlan has profited handsomely. Revenue generated by the claim repricing tool Data iSight increased from $23 million in 2012 to $323.7 million in 2019. Analytics-based services, like claims repricing tools, accounted for 59% of MultiPlan's revenue as of 2020. In 2021, the importance of analytics-based services to MultiPlan's bottom line grew, accounting for $709 million of MultiPlan's $1.1 billion in total revenue. In 2022, analytics-based services accounted for 66% of MultiPlan's revenue. During this time, MultiPlan consistently had profit margins "in excess of 70%."

216.    Due to the conspiracy's success in artificially suppressing out-of-network reimbursements, Defendants now plan to artificially suppress in-network healthcare claims. In a 2020 presentation to investors, MultiPlan shared its "Vision for MultiPlan 3.0," pursuant to which MultiPlan would "extend into in-network" repricing services. In other words, it would bring its claim repricing tools "to the in-network market" as part of a "cost management" strategy.

217.    MultiPlan projected that implementing MultiPlan 3.0, including by "[f]urther deploying artificial intelligence/machine learning" and continuing to "[c]ombine proprietary data with 3rd party data to develop more powerful analytics," would increase revenue by up to $1.15 billion and profits by $720 million.

218.    MultiPlan 3.0 involves a three-part "Enhance, Extend, and Expand growth strategy." By extending into "key adjacent markets" and using "AI and machine learning to identify greater savings" MultiPlan will "drive[] more savings for payer customers and support[] their priorities targeting providers and consumers." Put bluntly, MultiPlan intends to continue putting "savings" for their customers ahead of healthcare providers and consumers who it "target[s]," all while claiming to be "on the right side of healthcare."

### K.       Defendants Operate a "Hub and Spoke" Conspiracy.

219.    Defendants' conduct also can be characterized as a per se illegal hub-and-spoke price-fixing agreement that violates the Sherman Antitrust Act.

220.    Under this scenario, MultiPlan is the conspiracy's hub. The agreements between MultiPlan, the Non-MultiPlan Defendants, and the co-conspirators are the spokes. The agreement between the Non-MultiPlan Defendants and co-conspirators to collectively use MultiPlan's claim repricing tools to reprice out-of-network reimbursement claims while knowing that each other are doing the same is the conspiracy's rim.

221.    Commercial health insurance providers, including the Non-MultiPlan Defendants, unsuccessfully attempted to systematically underpay healthcare providers for out-of-network reimbursement claims before joining this conspiracy. These failures help explain the conspiracy's appeal to the Non-MultiPlan Defendants.

222.    For example, in 2015, UnitedHealthcare paid $11.5 million to resolve a lawsuit that alleged that it used automated software that improperly adjudicated healthcare claims to systematically underpay doctors and delay or deny payment to them. That same year, it paid $9 million to settle a claim for underpaying doctors in California. And in 2009, it paid $350 million to settle a claim based on using its internal database, Ingenix, to generate artificially low reimbursement rates for out-of-network healthcare services.

223.    As these successful lawsuits demonstrate, healthcare providers could combat attempts to underpay them before the conspiracy became effective on July 1, 2017, when UnitedHealthcare started using MultiPlan. In addition to seeking redress in the courts, they could refuse to provide non-emergency care to patients from insurance networks that attempted to bilk them out of fair reimbursement rates and instead provide those non-emergency services

exclusively to the patients belonging to other insurance networks. Commercial health insurance companies realized, therefore, that they must act collectively to suppress out-of-network reimbursement rates.

224.    MultiPlan marketed itself as the answer to the Non-MultiPlan Defendants' collective action problem. It would act as a hub that the Non-MultiPlan Defendants could use to work together to suppress payments for out-of-network reimbursement claims.

225.    MultiPlan's courtship of UnitedHealthcare is illustrative. When it recruited UnitedHealthcare to join the conspiracy, MultiPlan told UnitedHealthcare that 70% of its top 10 competitors used Data iSight to reprice out-of-network reimbursement claims. Although MultiPlan, through its Executive Vice President, Dale White, "did not specifically name competitors," UnitedHealthcare executive Lisa McDonnel wrote that "from what he did say we were able to glean who was who." Accordingly, "to bring[] UnitedHeath back into alignment with its primary competitor group on managing out-of-network costs," it needed to start using MultiPlan's repricing tools. Indeed, a United Healthcare executive lamented in sworn testimony that the company had fallen "behind some of [its] largest competitors" when it came to using MultiPlan's repricing tools to set the rate for reimbursing out-of-network claims. And according to UnitedHealthcare's Vice President of Network Payment Strategy, Rebecca Paradise, knowing that Data iSight "was widely used by our competitors" factored critically into UnitedHealthcare's decision to join the conspiracy.

226.    In addition to informing UnitedHealthcare about where it stood on pricing among its peers, MultiPlan recommended how UnitedHealthcare should set its reimbursement rate. MultiPlan specifically advised that UnitedHealthcare should never pay more than 350% of the unsustainably low Medicare reimbursement rate to bring it "in line with another competitor . . .

leading the pack along with another competitor."

227.    Former UnitedHealthcare executive John Haben testified that, throughout the conspiracy, MultiPlan provided UnitedHealthcare with information about competitor pricing. In fact, MultiPlan, as the conspiracy's hub, arranged for Client Advisory Board meetings where the spokes of this conspiracy, the Non-MultiPlan Defendants and co-conspirators, could come together to discuss how to better use MultiPlan to effectuate their anticompetitive scheme.

228.    This agreement between UnitedHealthcare and MultiPlan formed one spoke of the conspiracy. Every agreement between MultiPlan and its 700+ payor customers, including the agreements between MultiPlan and the top 15 health insurance payors, is another spoke in the hub-and-spoke conspiracy. MultiPlan convinced these other payors to use its claim repricing tools by using similar tactics to those it employed with United Healthcare, i.e., by advertising these tools as a way for payors to align reimbursement rates with their competitors.

229.    MultiPlan then encouraged continued commitment to the conspiracy by telling the "spokes" about which of their competitors used the claim repricing tools and how those tools allowed those competitors to profit by artificially suppressing reimbursements for out-of-network claims.

230.    The Non-MultiPlan Defendants, therefore, knew that its competitors had adopted or were considering adoption of the MultiPlan repricing tools as a way to underpay out-of-network healthcare service providers.

231.    Statements from Non-MultiPlan Defendants underscore the industry's alignment between competitors. In defending their use of MultiPlan's repricing tools to generate exorbitant shared "savings fees", UnitedHealthcare calls the tools and fees "an industry-standard approach." Similarly, Cigna describes the shared savings fee as in "align[ment] with industry standards."

Defendants' statements make it clear that they successfully operate and defend the conspiracy because they know that their co-conspirators have agreed to do the same.

232.    Sharing sensitive information facilitated the exchange of proprietary and confidential claims data between conspirators and imposed discipline on the conspiracy. This shared information also confirmed the agreement between the Non-MultiPlan Defendants and co-conspirators to depart from the traditional "usual and customary" pricing model (or FAIR health benchmarks) and instead use MultiPlan as a hub to fix the price for reimbursement of out-of-network claims, thereby evidencing the conspiracy's rim. And the information sharing amplified Defendants' motivation to take part in the conspiracy, as it alerted each conspirator that any unilateral attempt to reduce prices  would fail due to the conspiracy's existence.

233.    There is significant circumstantial evidence that the Non-MultiPlan Defendants agreed to use MultiPlan's claim repricing tools to suppress reimbursement rates on out-of-network claims and thereby formed the conspiracy's rim.

234.    As the conspiracy's hub, MultiPlan induced the spokes, i.e., the Non-MultiPlan Defendants and co-conspirators, to move in parallel away from price competition on reimbursing out-of-network claims, toward cooperatively using a shared pricing methodology for out-of-network claim pricing. There are numerous plus factors that tend to exclude the possibility that independent conduct gave rise to this parallel conduct.

235.    No valid independent business reason exists for the Non-MultiPlan Defendants and co-conspirators' agreement to use MultiPlan's repricing tools to artificially suppress the price paid for out-of-network healthcare services. Large Payors, like United Healthcare, could, and almost did, create internal repricing tools that did not rely on the use of shared claims data from their competitors. Small Payors could use the FAIR Health benchmark to reprice claims. Instead,

essentially all Payors, including the largest fifteen, agreed to use MultiPlan's claim repricing tools to suppress reimbursements. Why? MultiPlan assured the Non-MultiPlan Defendants and their co-conspirators that they all could conspire without worry of being undercut by competitors offering higher reimbursement rates.

### L. The Conspiracy Is *Per Se* Illegal.

236. Regardless of the conspiracy's form, Defendants' agreement to use the same method to fix the prices paid for out-of-network health services has clear anticompetitive effects and offers no procompetitive benefits, rendering it a facially anticompetitive, per se illegal restraint of trade.

237. Defendants knowingly provided and combined sensitive, nonpublic claims data into MultiPlan's algorithm and then relied on that common algorithm to set the reimbursement rate for out-of-network healthcare claims, while knowing that its competitors would do the same. Indeed, MultiPlan acknowledges that it "is deeply integrated into the proprietary claims adjudication system of its customers" and uses all these proprietary data sources to "drive" its analytics system.

238. Although this conspiracy harnesses new technology to accomplish its anticompetitive ends, it is a classic price-fixing conspiracy that courts have long deemed per se illegal. Indeed, the Sherman Antitrust Act's broad language "embraces all forms of combination, old and new," confirming that the use of new technology to facilitate a traditional price-fixing scheme does not inoculate Defendants from application of the per se rule. *United States v. Union Pac. R.R. Co.*, 226 U.S. 61, 85-86 (1912).

239. Defendants also cannot escape scrutiny under the per se rule simply by pointing to the absence of an agreement on the final reimbursement rate for a given service. The per se rule

applies because Defendants agreed to use the same method—MultiPlan's repricing tools and algorithms—to set reimbursement rates, and they knew that all other Defendants would rely on those same tools and algorithms because MultiPlan specifically informed them of this before and throughout the conspiracy. Simply put, Defendants understood that its competitors would rely on MultiPlan's algorithm to set reimbursement rates and it proceeded anyway, which suffices for application of the per se rule.

**M.     The Conspiracy Harms Competition and Lacks Procompetitive Benefits.**

240.    The conspiracy harmed competition in the market for reimbursements for out-of-network healthcare services claims by commercial payor Plaintiffs.

241.    Defendants' agreements to use MultiPlan's repricing tools to suppress the reimbursement rate for out-of-network services resulted in Defendants paying far less in out-of-network reimbursements claims to healthcare providers than they would have in the absence of the conspiracy. Absent this conspiracy, Defendants would have competed to adequately compensate Plaintiffs for out-of-network healthcare services so that their insureds could have wider access to a variety of healthcare providers, both in and outside their network.

242.    The underpayment of claims for out-of-network services has most obviously harmed Plaintiffs by giving them less money for the services they have provided to out-of-network patients. As a result, Plaintiffs have less to spend on, among other things, staff salaries, improvements to their facilities, increasing access to healthcare services, and medication and equipment.

243.    Plaintiffs cannot avoid the conspiracy's anticompetitive effects. As explained above, practically speaking, healthcare providers cannot reject MultiPlan's offered reimbursement rates and negotiate to obtain a better rate. As one healthcare provider explained, "When we reject

a [proposed MultiPlan reimbursement rate], it takes months to get any payment and we never get paid more than the amount" originally proposed. Indeed, sometimes MultiPlan will *reduce* the reimbursement rate even further if the healthcare provider does not immediately acquiesce.

244. Defendants' immense market power allows them to enforce compliance with their reimbursement rates. Providers ultimately accept these sub-competitive rates as often as 99.4% of the time and appeal them as infrequently as 2% of the time.

245. The scope of conspiracy's harm is broader than healthcare providers. The artificially suppressed payments for out-of-network healthcare services also harm healthcare consumers. Limiting revenue to healthcare providers limits their ability to improve the quality of and access to care. Plus, underpayments can also limit the supply of healthcare services by causing healthcare providers to fail. For instance, Verity Health System's bankruptcy caused the closure of St. Vincent Medical Center in Los Angeles, California. Verity Health System Liquidating Trust, in a separate lawsuit, attributes this bankruptcy to the conspiratorial behavior alleged here. Other providers require patients to pay for treatment upfront or refuse to treat out-of-network patients with certain health insurance plans because of their frustration with reduced reimbursement rates and the struggles to negotiate for higher rates.

246. The conspiracy puts rural hospitals at special risk of closing. As explained by the American Hospital Association ("AHA"): "America's rural and community hospitals need competitive reimbursements from commercial payors to carry out their core mission of providing care for their patients and communities." AHA Amicus Br. at 10. A recent study

> estimate[es] that "[m]ore than 200 rural hospitals are at *immediate risk of closure* because they aren't making enough money to cover the rising cost of providing care, and their low financial reserves leave them little margin for error." The same study found that another 400 rural hospitals "are at risk of closure in the near future." The article notes that payments "particularly from commercial insurance plans" have failed to keep up with cost increases. These

insufficient payments are even more problematic for rural hospitals: relative to urban hospitals, rural hospitals serve less populated areas and are therefore "less likely to see enough patients on average to cover costs."

*Id.* at 9–10 (citations omitted).

247. Other rural healthcare providers also feel the pinch caused by the conspiracy. A rural Virginia provider of behavioral therapy services for children with autism charges the Medicaid reimbursement rate for her services. Nevertheless, Aetna, relying on MultiPlan's repricing tools, would only pay her half the Medicaid rate.

248. The conspiracy also capitalizes on the inability of hospital emergency departments to avoid the conspiracy's effects.

249. Per the United States Centers for Disease Control and Prevention, there were 139.8 million emergency department visits in 2021, or 42.7 per 100 people. Commercial health insurance covered just over 45 million of these emergency department visits.

250. According to the AHA, as of 2020, there were 4,589 emergency departments in the United States. Just under 49,000 doctors staffed these emergency departments.

251. The importance of emergency care to the American health system continues to grow. As recent studies have shown, the rate of visits to emergency departments has outpaced the population growth rate.

252. Emergency department medical services have highly inelastic demand. Inelastic demand means that when a price for a product or service increases, consumers' buying habits stay about the same, and when the price for a product or service decreases, consumers' buying habits also remain relatively unchanged. Frequently, patients have little or no choice concerning where they receive emergency care. And rarely can they or should they avoid or postpone emergency care.

253. Hospitals must provide emergency medical services to all those who seek them.

The Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, requires emergency medical departments to "provide for an appropriate medical screening examination" when someone seeks care from an emergency medical department. *Id.* at § 1395dd(a). Those departments must "stabilize" any person with "an emergency medical condition" without asking about "the individual's method of payment or insurance status." *Id.* at § 1395dd(b), (h). Each violation of the EMTALA results in monetary penalties of up to $50,000. *Id.* § 1395dd(d)(1)(A). State laws impose similar requirements. N.Y. Comp. Codes R. & Regs. tit. 10, § 405.19(e)(1); Fla. Stat. § 395.1041.

254. Although commercial insurance networks generally require healthcare providers to obtain preauthorization before providing healthcare services, that general practice does not apply to the provision of emergency healthcare services. *See* 26 U.S.C. § 9816(a)(1)(A); N.Y. Ins. Law § 3221(k)(4)(A)(i); Fla. Stat. § 627.64194(2)(A).

255. Hospital emergency departments rely on commercial insurance providers, such as Defendants, to fairly reimburse them for out-of-network healthcare services to offset the financial imposition caused by the requirement that they treat all people seeking emergency healthcare services regardless of their ability to pay. When commercial insurance companies fail to fairly reimburse healthcare providers, they abuse the system. *N.Y. City Health & Hosps. Corp. v. Wellcare of N.Y., Inc.*, 937 N.Y.S.2d 540, 545 (N.Y. App. Div. 2011) ("[W]here, as here, a hospital is required by law to treat patients in an emergency room, an insurance company is unjustly enriched if it fails to pay the hospital in full for the costs incurred in rendering the necessary treatment to the insurer's enrollees.").

256. Defendants here have abused the system in just this way—and placed an unfair financial burden on Plaintiffs—by conspiring to underpay healthcare providers for out-of-

network healthcare services. Due to the conspiracy, commercial health insurance companies generally pay 50% or less of the value of emergency department out-of-network claims. For example, one study of Florida emergency department visits found that the average emergency doctor charged $679 per visit even though the FAIR Health database, which collects publicly available data from billions of health insurance claims, identified $950 as the 80th percentile charge for high acuity emergency department visits. Despite the reasonableness of the emergency doctors' charges, insurers still typically paid only $307 per claim. Thus, the average emergency doctor provider $138,000 in free emergency healthcare annually.

257.    The COVID-19 pandemic only increased the strain on America's hospitals. The AHA explains that "the pandemic triggered a nationwide financial crisis for hospitals and health systems. During the early stages of the pandemic, America's hospitals provided lifesaving care to millions as most of the country remained in lockdown. Yet, at the same time, hospitals incurred devastating financial losses." AHA Amicus Br. at 3. Although society has weathered the worst of the pandemic, "hospitals still feel [its] economic effects." *Id.* Yet, at the same time, "the large commercial health insurers that use MultiPlan are more profitable than ever. COVID-19, it turns out, was a financial boon to the commercial health insurance industry." *Id.* at 7. Despite this dynamic, Defendants' conspiracy continues unabated. Indeed, Defendants intend to expand its scope.

258.    Defendants hypothesize that its conspiracy benefits consumers by reducing consumer healthcare costs. But that theory does not match reality. As one healthcare analyst explained:

> Theoretically, MultiPlan's harsh negotiation tactics should be good for rising American health care costs; insurers are supposed to lower costs by negotiating lower prices on behalf of the patient. But instead, MultiPlan acts like a mafia enforcer for insurers, forcing doctors to accept low payments while insurance

premiums for patients . . .somehow continue to rise.

259.    Statistical evidence supports this analysis. The Centers for Medicare and Medicaid Services found that out-of-pocket health expenditures increased $67.3 billion, or 18.3%, from 2016, the year before the conspiracy started, to 2021. It projects another $86.4 billion in increased out-of-pocket expenditures between 2021 and 2025, equating to a 42% increase in out-of-pocket health care expenditures during the conspiracy.

260.    Private health insurance expenditures have seen similar increases: $180.6 billion, or 17.5%, from 2016 to 2021, with another $320.8 billion between 2021 to 2025, for a 48.6% increase in private health insurance expenditures during the conspiracy.

261.    Plus, healthcare providers report that MultiPlan has rewarded them for inflating the prices they charge for services. Indeed, healthcare providers must do this just to receive MultiPlan's artificially suppressed reimbursement rates. At bottom, the conspiracy helps Defendants alone to the detriment of healthcare providers and consumers.

262.    When sworn to tell the truth, Defendants' executives admitted to the reasonableness of healthcare providers' charges for out-of-network services. For example, at trial, former United Healthcare executive John Haben undercut United Healthcare's mischaracterization of emergency department charges as "egregious." He specifically refused to label a $1,428 bill as "egregious," saying that the life-saving care justified the "reasonable" charge. He testified that, "[i]f you put it in the perspective of saving somebody's life, $1,400 is not a lot of money." Conversely, he characterized United Healthcare's reimbursement rate of $254, which MultiPlan facilitated, as "low."

263.    A recent study shows the importance of emergency healthcare services in not only providing life-saving care to patients, but also in controlling healthcare costs. Laura G. Burke, et al., *Trends in Costs of Care for Medicare Beneficiaries Treated in the Emergency Department from*

64

*2011 to 2016*, JAMA Network Open (Aug. 2020). As the study's lead author explained:

> Too often discussions of the cost of emergency care fail to consider the bigger picture—that spending on emergency care can save lives, alleviate suffering and in some instances avoid the need for a more expensive hospitalization. Emergency
> physicians treat anyone, anytime and serve as the safety net for the nation's acute care system.

264.    Too busy maligning healthcare providers and too focused on their bottom line, Defendants "fail to consider the bigger picture."

265.    MultiPlan also claims that its repricing tools, specifically Data iSight, makes providers "less likely to balance bill members." But patients tell a different story.

266.    One patient received a bill exceeding $100,000 after UnitedHealthcare, relying on MultiPlan's claim repricing tools, paid only $5,449.27 to a doctor who performed a lengthy, complicated procedure to repair tissue and close a wound when her incision from heart surgery failed to heal. Another patient who received a large bill from her therapist due to MultiPlan's claim repricing tools stopped receiving the therapy she needed due to the expense, explaining that "they basically took away the mental health care I was getting." One woman incurred tens of thousands in bills for opioid addiction treatment for her teenage son because of her insurer's use of MultiPlan's repricing tools. Another woman who received insurance through Aetna incurred about $60,000 in medical bills to see a specialist for her chronic back pain.

267.    Unfortunately, examples like these of rising consumer costs due to MultiPlan's claim repricing tools, specifically Data iSight, abound: One woman saw chiropractor appointments to manage chronic pain double in cost. Another's therapy appointments became nearly twice as costly. One man had to pay more than two-thirds of the bill for an ambulance to take his 14-year- old son to the emergency room. And another received almost $300,000 in charges for spine surgery.

268.     At the same time consumers are receiving large bills to compensate for the underpayments generated by the MultiPlan repricing tools, the consumers also receive audacious letters from the same insurance companies characterizing the billed amounts as *savings*.

269.     For example, one insurer identified thousands of dollars of fertility treatments that a woman was billed for as an amount that she "saved." Another man paid the portion of a claim identified as his "discount" so his daughter could receive occupational and speech therapy.

270.     Patients cannot avoid or ameliorate the problem by attempting to pay charges up front and seek reimbursement. One man explained that he paid for therapy up front, only to have his reimbursement rates, like those of healthcare providers, drop.

271.     And finally, as explained above, the "processing fees" that Payors charge to their customers impose significant healthcare costs on employers or other entities with self-funded insurance plans administered by the payors.

### N.     Defendants' Actions Have No Procompetitive Benefits.

272.     Defendants' collective pricing scheme has harmed competition while producing no procompetitive effects.

273.     While Defendants' misconduct has increased their revenues and profits, it has harmed competition, healthcare providers, and consumers. Defendants have systematically paid sub- competitive reimbursements for out-of-network healthcare services, which reduces the revenue available to healthcare providers to improve and expand access to healthcare. The conspiracy has also already limited consumers' healthcare options due to hospital closures forced by the conspiracy. The conspiracy does not, however, contain healthcare costs. Defendants burden healthcare providers and consumers to benefit themselves alone, all while unfairly labeling healthcare reimbursement claims as "egregious" to justify their misconduct.

274.    Defendants' conspiracy has introduced inefficiencies and artificially reduced payments to healthcare service providers providing the out-of-network care that is vital to our healthcare system. Simply put, the conspiracy provides no procompetitive benefits.

275.    Even assuming the existence of any de minimis procompetitive benefit from Defendants' misconduct, it could not outweigh the significant and ongoing anticompetitive effects of the conspiracy.

## INTERSTATE COMMERCE

276.    Defendants' conduct as described herein has engaged in and substantially affected interstate commerce. Healthcare providers that Defendants reimburse for out-of-network health services, such as Plaintiffs, provide services, goods, and facilities to people who reside in many states. Defendants also operate PPOs throughout the United States. Defendants' conspiracy comes within the flow of and intentionally, directly, substantially, and reasonably foreseeably affects interstate commerce in the United States.

## FRAUDULENT CONCEALMENT

277.    Defendants have affirmatively and fraudulently concealed the conspiracy by various means and methods from at least July 1, 2017, through the present. Thus, Plaintiffs had neither actual nor constructive knowledge of the facts giving rise to their claim for relief. They did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of Defendants' conspiracy until shortly before filing this Complaint.

278.    Defendants engaged in a secret and inherently self-concealing conspiracy that did not reveal facts sufficient to put Plaintiffs on inquiry notice.

279.    Defendants intentionally conducted their anticompetitive scheme outside of public scrutiny:

A. The Non-MultiPlan Defendants privately submitted their own claims data to MultiPlan, and MultiPlan in turn used its proprietary repricing tools, the details of which remain confidential, to recommend reimbursement rates;

B. Defendants regularly attended invitation-only industry events, including ones MultiPlan held and sponsored, where they discussed behind closed doors how MultiPlan's repricing tools allowed them to reduce costs by suppressing out-of-network reimbursement rates; and

C. Defendants had private communications and meetings to discuss out-of-network claim repricing, MultiPlan's repricing tools, and use of those tools, including by each Defendant's competitors.

280. Although MultiPlan claims to provide an explanation of its pricing methodology to providers, it and the Non-MultiPlan Defendants intentionally hid from Plaintiffs that they outsourced pricing of out-of-network reimbursement claims to a shared pricing system that used Defendants' real-time, non-public claims data and combined it with their competitors' real-time, non-public claims data to set out-of-network reimbursement rates.

281. Defendants, as competitors, enter into horizontal agreements to artificially suppress reimbursements to healthcare providers for out-of-network healthcare services. Those agreements contain non-disclosure and confidentiality clauses that prevent dissemination of the contracts' terms. Because Plaintiffs are not parties to those agreements, they did not and could not reasonably access the contract terms that would possibly have alerted them to the antitrust claim.

282. MultiPlan also made false and misleading statements to conceal that it colluded with its competitors—other commercial health insurance companies—to artificially suppress payments to healthcare providers.

283. MultiPlan publicly states that it is not a commercial health insurance company.

284. For instance, a banner at the top of its homepage states, in bold, that, "We are not an insurance company." Elsewhere on its website, MultiPlan states that, "MultiPlan is not a

health insurance company and does not sell insurance directly or indirectly through agents or brokers." And in the "About MultiPlan" section of its press releases, MultiPlan describes itself as the "partner" of health insurance companies, nowhere disclosing that it is also a health insurance company.

285.    Because MultiPlan is, in fact, a health insurance company, these statements are, at best, misleading. MultiPlan operates one of the largest and most well-established PPO networks in the United States. In fact, it claimed that it became "the largest independent primary PPO network in the US" in 2006.

286.    As with other health insurance networks, users access the healthcare providers in MultiPlan's PPO network for a fee. MultiPlan then administers and adjudicates claims for healthcare services in that network. The only difference between MultiPlan's network and other health insurance networks is that MultiPlan opts to negotiate with other health insurance companies, instead of employers or individual subscribers, to access its network. Simply put, MultiPlan's statements that it is "not a health insurance company" are false. Nevertheless, MultiPlan repeatedly made these statements intending for Plaintiffs and healthcare consumers to rely on them.

287.    Through Defendants' knowing and active concealment of their misconduct, Plaintiffs did not receive information that should have put them, or any reasonable person or provider standing in their shoes, on sufficient notice of collusion worthy of further investigation.

288.    Plaintiffs could not have had inquiry notice of Defendants' collusion before March 7, 2022 at the earliest, which is the date when an article on The Capitol Forum website first raised concerns about MultiPlan's antitrust compliance.[5] The article and the law professors

---

[5] Multiplan: Company's Information Sharing, Meetings Practices Could Raise Antitrust Concerns, Experts Say, The Capitol Forum (Mar. 7, 2022),

quoted in it did not, however, conclusively state that MultiPlan's practices violated the antitrust laws. An ordinary person acting reasonably diligently would not have had the time, resources, or specialized training to uncover the misconduct that Plaintiffs, through counsel highly experienced in antitrust class action litigation, have alleged in this Complaint.

289.    Moreover, other lawsuits involving MultiPlan were insufficient to alert Plaintiffs to the antitrust claims alleged herein. For instance, one suit involved in-network claims and did not allege antitrust violations.[6] Another did not allege a conspiracy between MultiPlan and health insurance companies or raise an antitrust claim.[7] Two others focused only on the relationship between MultiPlan and one health insurance provider; and one of those suits did not raise an antitrust claim.[8] Finally, the Verity antitrust lawsuit filed in California state court, like the others involving MultiPlan, also did not put Plaintiffs on notice of the claims asserted herein. *In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355, 373 (D.N.J. 2001) ("[T]he filing of a private lawsuit by an unrelated party in a different vicinage" would not "put consumers on notice . . . that a price-fixing conspiracy was afoot.").

290.    The antitrust laws apply to reimbursement payments made to healthcare providers. Plaintiffs, therefore, reasonably considered the market for reimbursement payments from commercial health networks to be competitive before the recent events alleged herein.

291.    Plaintiffs exercised reasonable diligence at all times since July 1, 2017. Plaintiffs could not have discovered Defendants' alleged misconduct sooner by exercising reasonable diligence because of Defendants' deceptive and secretive actions to conceal their misconduct.

---

https://thecapitolforum.com/multiplan-companys-information-sharing-meetings-practices-could-raise-antitrust-concerns-experts-say/.

[6] *See Plastic Surgery Ctr., P.A. v. Cigna Health & Life Ins. Co.*, No. 17-2055 (D.N.J.).

[7] *See Hott v. MultiPlan, Inc.*, 21 Civ. 02421 (S.D.N.Y.).

[8] *See LD v. United Behav. Health*, 4:20cv2254 (N.D. Cal.) (no antitrust claim); *Pac. Recovery Sols. v. United Behav. Health*, 4:20cv2249 (N.D. Cal.).

292.    Since discovering the possibility of anticompetitive conduct, Plaintiffs have diligently examined Defendants' behavior regarding the suppression of reimbursement rates for out-of-network claims, their coordination regarding the same, and the effects of such suppression through publicly available sources, such as Defendants' public statements and media coverage regarding Defendants and the actions underpinning this conspiracy. Once this investigation revealed a basis for filing this claim, Plaintiffs promptly did so.

293.    Defendants' fraudulent concealment of their wrongful conduct has tolled and suspended the running of the statute of limitations concerning the claims and rights of action of Plaintiffs arising from the conspiracy, including all parts of the class earlier in time than the four years immediately preceding this Complaint's date.

## CONTINUING VIOLATION

294.    Defendants' conduct has also resulted in a continuing violation against Plaintiffs.

295.    After the initial formation of the conspiracy, Defendants committed and continue to commit overt acts that are part of the ongoing violation.

296.    Defendants frequently meet at Client Advisory Board meetings and other ad hoc meetings between MultiPlan and its customers to discuss how to improve their conspiracy's efficacy in suppressing out-of-network reimbursements to healthcare providers.

297.    Defendants renew their MultiPlan contracts to strengthen and continue the conspiracy, and these new agreements are continuing violations of the antitrust laws. These new agreements include the 2022 contract between MultiPlan and UnitedHealthcare, which kept the largest commercial health insurer in the conspiracy and ensured the conspiracy's survival.

298.    Defendants also forced shared savings agreements onto employee benefit plans to lock in their profits from artificially suppressing out-of-network reimbursement rates.

299.    Defendants' overt actions were new acts beyond the initial conspiracy agreement and necessary to continue the conspiracy. These overt acts continue from at least July 1, 2017, through the present. Renewing and strengthening the agreements that underpin the conspiracy and locking in its benefits, has inflicted new and accumulating injury on Plaintiffs.

300.    These continuing violations have tolled and suspended the running of the statute of limitations concerning the claims and rights of action of Plaintiffs arising from the conspiracy, including all parts of the class earlier in time than the four years immediately preceding this Complaint's date.

## ANTITRUST INJURY AND STANDING

301.    This conspiracy directly damages Plaintiffs' businesses and property and restrains competition in the market for reimbursements for out-of-network healthcare services paid by commercial payors.

302.    Plaintiffs have sustained and continue to sustain economic losses—the full amount of which they will calculate after discovery and prove at trial—due to Defendants artificially suppressing the reimbursement rate for out-of-network healthcare services.

303.    But for the Defendants' conspiracy to fix the price paid for out-of-network healthcare services, Plaintiffs would have received fair and competitive reimbursements for their out-of-network healthcare services.

304.    While the conspiracy continues, Plaintiffs will continue to suffer losses.

305.    The antitrust laws aim to prevent injuries such as those alleged here that stem from a conspiracy among buyers to systematically suppress the price paid for a good or service, such as out-of-network healthcare services. Indeed, it is axiomatic that agreements to reduce price competition or fix prices violate the antitrust laws.

306.     Here, the Non-MultiPlan Defendants accept MultiPlan's claim repricing tool recommended rate between 98–99% of the time. In other words, the Non-MultiPlan Defendants and co-conspirators outsource out-of-network claim pricing to MultiPlan. This shared pricing "brain" relies on the real-time, proprietary claims data of their competitors to set prices between 98–99% of the time.

307.     Even in those rare instances where the Non-MultiPlan Defendants and co-conspirators do not defer completely to the MultiPlan rate, that artificially suppressed rate still affects prices because it artificially lowers the baseline reimbursement rate from which the Non-MultiPlan Defendants and co-conspirators base their ultimate rates.

308.     Moreover, use of MultiPlan's claim repricing tools to set collusive, artificially suppressed reimbursements rates subverts the competitive process more generally by depriving the market of "independent centers of decision-making" and replacing them with decision-making on prices by one shared pricing "brain." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010) ("'Concerted activity inherently is fraught with anticompetitive risk' insofar as it 'deprives the marketplace of independent centers of decision-making that competition assumes and demands.'" (quoting The antitrust laws also aim to prevent this anticompetitive conduct.

## CLASS ACTION ALLEGATIONS

309.     Plaintiff brings this action on behalf of itself and the following class ("Class") of all others similarly situated under Federal Rule of Civil Procedure 23(a) and (b)(3):

> All persons or entities whom one or more of Defendants or co-conspirators, or a division, subsidiary, predecessor, agent, of affiliate of such entities, have reimbursed for out-of-network healthcare services from no later than July 1, 2017, until Defendants' unlawful conduct and anticompetitive effects cease. The class excludes federal and state governmental entities and judicial officers presiding over this case.

310.    The Class is so numerous that joinder of all members in this action is impracticable. There are hundreds, if not thousands, of geographically dispersed Class members.

311.    The Class members can be readily identified and notified in an administratively feasible manner using, among other information, the Class members' electronic transactional records of out-of-network claims reimbursements.

312.    Plaintiff's claims are typical of those of the Class. Plaintiff and all Class members claim that Defendants' alleged misconduct violates Section 1 of the Sherman Antitrust Act. Plaintiff and all Class members also allege and will show that the same anticompetitive and unlawful conduct injured them and caused them to receive reimbursements for out-of-network claims that were lower than what they would have received absent Defendants' collusive conduct.

313.    Plaintiff will fairly and adequately protect and represent the interests of the Class members. The interests of Plaintiff and Plaintiff's counsel fully align with, and are not antagonistic to, the interests of the Class members. Plaintiff will and can dispatch the duties incumbent on a class representative to protect the interests of all Class members. Plaintiff's counsel also have significant experience successfully prosecuting complex antitrust class actions, and they possess the resources needed to vigorously litigate the case to the greatest extent necessary for the Class.

314.    There are many legal and factual questions common to the Class and susceptible to proof by the Class with evidence common to all Class members, including:

A.    Whether Defendants formed a purely horizontal agreement, combination, conspiracy, or common understanding in which they artificially suppressed the rate paid on out-of-network healthcare service reimbursement claims throughout the United States;

B.    Whether, in the alternative, Defendants formed a hub-and-spoke agreement, combination, conspiracy, or common understanding in which they artificially suppressed the rate paid on out-of-network healthcare service reimbursement claims throughout the United States;

C.  Whether Defendants' alleged misconduct constitutes a per se violation of Section 1 of the Sherman Antitrust Act;

D.  Whether Defendants' alleged misconduct, in the alternative, violates Section 1 of the Sherman Antitrust Act pursuant to a quick look or full Rule of Reason analysis;

E.  Whether Defendants' alleged misconduct in fact caused Class members throughout the United States to receive artificially suppressed reimbursements on out-of-network healthcare service reimbursement claims;

F.  The proper measure of Class-wide damages;

G.  The scope and extent of injunctive relief needed to remedy the anticompetitive effects of Defendants' alleged conduct going forward; and

H.  Whether Defendants fraudulently concealed the existence of the alleged conspiracy or committed continuing antitrust violations beyond the initial conspiratorial agreement, thereby tolling the statute of limitations.

315.   Counsel experienced and competent in prosecuting complex antitrust and unfair competition class actions represent Plaintiff.

316.   Legal and factual questions common to Class members will predominate over any individualized legal or factual questions. Defendants have acted and refused to act on grounds generally applicable to the Class.

317.   In cases that allege price-fixing among competitors, including those with a potential hub-and-spoke component, the common legal and factual question regarding the conspiracy's alleged existence by itself has been held to predominate over any possible individualized issues, thus warranting certification. So too here.

318.   Class treatment is the superior method for the fair and efficient adjudication of this controversy. It allows the many Class members to prosecute their common claims, and Defendants to defend themselves against these claims, in one court simultaneously and efficiently without the

unnecessary duplication of effort and expense presented by separate actions. The benefits of proceeding with this procedural mechanism, including providing injured people with a way to obtain redress for claims that may be impracticable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this case as a class action.

## CAUSES OF ACTION

### COUNT ONE
**Horizontal Conspiracy in Restraint of Trade**
**Violation of Section 1 of the Sherman Antitrust Act**
**(15 U.S.C. § 1)**

319.     Plaintiff incorporates and realleges, as though fully set forth herein, every allegation set forth in the preceding paragraphs of this Complaint.

320.     Plaintiff seeks monetary and injunctive relief on behalf of itself and all other Class members under Section 4 of the Clayton Antitrust Act for Defendants' conduct in violation of Section 1 of the Sherman Antitrust Act.

321.     Beginning no later than July 1, 2017, Defendants formed and engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

322.     The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants to knowingly and collectively use MultiPlan's repricing tools to set reimbursement rates for out-of-network healthcare services. This conspiracy has caused Plaintiffs to receive artificially suppressed reimbursements for out-of-network healthcare services during the Class Period.

323.     As detailed above, the contract, combination, or conspiracy alleged herein has taken the form of a horizontal conspiracy between competitors in the United States commercial health insurance market.

324.    In the alternative, and as detailed above, the contract, combination, or conspiracy alleged herein has taken the form of a horizontal conspiracy between competitors, Non-MultiPlan Defendants, and a potential competitor, MultiPlan, in the United States commercial health insurance market.

325.    To further this contract, combination, or conspiracy, Defendants have committed various acts, including the acts discussed above and those that follow:

A.    Non-MultiPlan Defendants provided real-time, private, confidential, and detailed internal claims data with MultiPlan for use in MultiPlan's out-of-network claim repricing tools;

B.    MultiPlan sold and operated its out-of-network claim repricing tools that repriced the reimbursement rate for out-of-network healthcare services claims;

C.    Defendants knowingly used the same out-of-network claim repricing tools that incorporated other Defendants' real-time, private, confidential, and detailed internal claims data to calculate reimbursement rates for out-of-network healthcare services claims;

D.    Defendants paid reimbursements for out-of-network healthcare services claims at the rates recommended by MultiPlan's repricing tools;

E.    Defendants outsourced out-of-network claims handling to MultiPlan knowing that MultiPlan would set the reimbursement rate for out-of-network healthcare claims at the rates recommended by its repricing tools;

F.    Defendants exchanged sensitive real-time, private, confidential, and detailed internal claims data with each other, including by using the MultiPlan out-of-network claims repricing tools; and

G.    Defendants used many forms and methods of bilateral and multilateral communication across various settings and venues concerning the reimbursement rate for out-of-network healthcare services claims, including their use of MultiPlan's out-of-network claim repricing tools, that had the purpose and effect of maintaining and reinforcing their anticompetitive scheme.

326.    Defendants possess market power in the relevant antitrust market for

reimbursements of healthcare services claims by commercial Payors. The relevant product market is reimbursements of out-of-network healthcare services claims by commercial Payors. The relevant geographic market is the United States.

327.    Defendants' contract, combination, or conspiracy has led to anticompetitive effects in the form of artificially suppressed reimbursement rates for out-of-network healthcare services claims that fall below the traditional and competitive rates for such claims.

328.    As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Antitrust Act, Plaintiff has been injured in its business or property and will continue to be injured in its business and property by receiving lower reimbursements for out-of-network healthcare services claims than what it would have received absent the conspiracy.

329.    There are no procompetitive justifications for the Defendants' conspiracy, and to the extent any proffered procompetitive justifications exist, they could have been achieved through less restrictive means.

330.    Defendants' conspiracy is a per se violation of Section 1 of the Sherman Antitrust Act. In the alternative, Defendants' conspiracy violates Section 1 of the Sherman Antitrust Act under either a quick look or full Rule of Reason analysis.

## COUNT TWO
### Hub-and-Spoke Conspiracy in Restraint of Trade
### Violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1)
### (Pled in the alternative to Counts 1 and 3)

331.    Plaintiff incorporates and realleges, as though fully set forth herein, every allegation set forth in the preceding paragraphs of this Complaint.

332.    In the alternative to Count One, and as detailed above, the contract, combination, or conspiracy to unreasonably restrain trade and commerce alleged herein has taken the form of a hub-and-spoke conspiracy in which MultiPlan served as the hub, the agreements between

MultiPlan and the Non-MultiPlan Defendants and co-conspirators to use MultiPlan's claim repricing tools served as spokes, and the agreement between the spokes to use MultiPlan's repricing tools to reprice reimbursement rates for out-of-network healthcare services claims serve as the rim. This conduct, which began no later than July 1, 2017, violates Section 1 of the Sherman Antitrust Act.

333. Plaintiff seeks monetary and injunctive relief on behalf of itself and all other members of the Class under Section 4 of the Clayton Antitrust Act for this violation.

334. The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants to knowingly and collectively use MultiPlan's repricing tools. This conspiracy has caused Plaintiffs to receive artificially suppressed reimbursements on claims for out-of-network healthcare services during the Class Period.

335. To further this contract, combination, or conspiracy, Defendants have committed various acts, including the acts discussed above and those that follow:

    A.    Non-MultiPlan Defendants provided real-time, private, confidential, and detailed internal claims data with MultiPlan for use in MultiPlan's out-of-network claim repricing tools;

    B.    MultiPlan sold and operated its out-of-network claim repricing tools that repriced the reimbursement rate for out-of-network healthcare services claims;

    C.    Defendants knowingly used the same out-of-network claim repricing tools that incorporated other Defendants' real-time, private, confidential, and detailed internal claims data to calculate reimbursement rates for out-of-network healthcare services claims;

    D.    Defendants paid reimbursements for out-of-network healthcare services claims at the rates recommended by MultiPlan's repricing tools;

    E.    Defendants outsourced out-of-network claims handling to MultiPlan knowing that MultiPlan would set the reimbursement rate for out-of-network healthcare claims at the rates recommended by its repricing tools;

F.    Defendants exchanged sensitive real-time, private, confidential, and detailed internal claims data with each other, including by using the MultiPlan out-of-network claims repricing tools; and

G.    Defendants used many forms and methods of bilateral and multilateral communication across various settings and venues concerning the reimbursement rate for out-of-network healthcare services claims, including their use of MultiPlan's out-of-network claim repricing tools, that had the purpose and effect of maintaining and reinforcing their anticompetitive scheme.

336.    Defendants possess market power in the relevant antitrust market: the market for reimbursements of healthcare services claims by commercial payors. The relevant product market is reimbursements of out-of-network healthcare services claims by commercial payors. The relevant geographic market is the United States.

337.    Defendants' contract, combination, or conspiracy has led to anticompetitive effects in the form of artificially suppressed reimbursement rates for out-of-network healthcare services claims that fall below the traditional and competitive rates for such claims.

338.    As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Antitrust Act, Plaintiff has been injured in its business or property and will continue to be injured in its business and property by receiving lower reimbursements for out-of-network healthcare services claims than what it would have received absent the conspiracy.

339.    There are no procompetitive justifications for Defendants' conspiracy, and to the extent any proffered procompetitive justifications exist, they could have been achieved through less restrictive means.

340.    Defendants' conspiracy is a per se violation of Section 1 of the Sherman Antitrust Act. In the alternative, Defendants' conspiracy violates Section 1 of the Sherman Antitrust Act under either a quick look or full Rule of Reason analysis.

**COUNT THREE**
**Conspiracy to Unreasonably Restrain Trade**
**Violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1)**
**(Pled in the alternative to Counts 1 and 2)**

341.    Plaintiff incorporates and realleges, as though fully set forth herein, every allegation set forth in the preceding paragraphs of this Complaint.

342.    In the alternative to Counts 1 and 2, and as detailed above, beginning no later than July 1, 2017, MultiPlan engaged in a continuing agreement with the Non-MultiPlan Defendants and co-conspirators to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Antitrust Act. Each agreement between MultiPlan and the Non-MultiPlan Defendants and co-conspirators to outsource the pricing of reimbursements for out-of-network healthcare services claims to MultiPlan unreasonably restrains trade in violation of Section 1 of the Sherman Antitrust Act.

343.    Plaintiff seeks monetary and injunctive relief on behalf of itself and all other members of the Class under Section 4 of the Clayton Antitrust Act for this violation.

344.    The contract, combination, or conspiracy alleged herein has consisted of continuing agreements between MultiPlan and the Non-MultiPlan Defendants and co-conspirators to knowingly and collectively use MultiPlan's repricing tools to artificially suppress the reimbursement rates for out-of-network healthcare services claims. This conspiracy has intentionally harmed the market for reimbursements for out-of-network healthcare services claims by artificially suppressing the reimbursement rates for out-of-network healthcare services claims and has harmed Plaintiff by causing it to receive artificially suppressed reimbursements for out-of-network healthcare services claims during the Class Period.

345.    To further this contract, combination, or conspiracy, Defendants have committed various acts, including the acts discussed above and those that follow:

A. Non-MultiPlan Defendants provided real-time, private, confidential, and detailed internal claims data with MultiPlan for use in MultiPlan's out-of-network claim repricing tools;

B. MultiPlan sold and operated its out-of-network claim repricing tools that repriced the reimbursement rate for out-of-network healthcare services claims;

C. Defendants knowingly used the same out-of-network claim repricing tools that incorporated other Defendants' real-time, private, confidential, and detailed internal claims data to calculate reimbursement rates for out-of-network healthcare services claims;

D. Defendants paid reimbursements for out-of-network healthcare services claims at the rates recommended by MultiPlan's repricing tools;

E. Defendants outsourced out-of-network claims handling to MultiPlan knowing that MultiPlan would set the reimbursement rate for out-of-network healthcare claims at the rates recommended by its repricing tools;

F. Defendants exchanged sensitive real-time, private, confidential, and detailed internal claims data with each other, including by using the MultiPlan out-of-network claims repricing tools; and

G. Defendants used many forms and methods of bilateral and multilateral communication across various settings and venues concerning the reimbursement rate of out-of-network healthcare services claims, including their use of MultiPlan's out-of-network claim repricing tools, that had the purpose and effect of maintaining and reinforcing their anticompetitive scheme.

346. Defendants possess market power in the relevant antitrust market: the market for reimbursements of healthcare services claims by commercial payors. The relevant product market is reimbursements of out-of-network healthcare services claims by commercial payors. The relevant geographic market is the United States.

347. Defendants' agreements have led to anticompetitive effects in the form of artificially suppressed reimbursement rates for out-of-network healthcare services claims that fall below the traditional and competitive rates for such claims.

348. As a direct and proximate result of Defendants' past and continuing violations of Section 1 of the Sherman Antitrust Act, Plaintiff has been injured in its business or property and will continue to be injured in its business and property by receiving reimbursements for out-of-network healthcare services claims that are lower than what it would have received absent these agreements in restraint of trade.

349. There are no procompetitive justifications for Defendants' agreements, and any proffered procompetitive justifications, to the extent any exist, could have been achieved through less restrictive means. Defendants' agreements, therefore, violate Section 1 of the Sherman Antitrust Act under a Rule of Reason analysis.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the Class of all others similarly situated, respectfully requests judgment against Defendants as follows:

A. The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and Plaintiff's counsel of record as Class Counsel as separately requested and as indicated below, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class once certified;

B. The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed to violate Section 1 of the Sherman Antitrust Act;

C. Plaintiff and the Class recover damages, to the maximum extent allowed under the applicable laws, and that a joint and several judgment in favor of Plaintiff and the members of the Class be entered against Defendants in an amount to be trebled under applicable law;

D. Defendants, their affiliates, successors, transferees, assignees, officers, directors, partners, agents, and employees thereof, and all other people acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.      Plaintiff and the Class be awarded pre- and post-judgment interest in the maximum amount and to the maximum extent permitted by law;

F.      Plaintiff and the Class recover their costs of suit and reasonable attorneys' fees to the maximum extent allowed by law; and

G.      Plaintiff and the Class be awarded any other relief as the case may require and the Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiff demands a jury trial under Federal Rule of Civil Procedure 38(b) on all triable issues.

Dated: July 31, 2024

/s/ Kenneth A. Wexler
Kenneth A. Wexler
Justin N. Boley
Melinda J. Morales
**WEXLER BOLEY & ELGERSMA LLP**
311 S. Wacker Dr., Suite 5450
Chicago, IL 60606
Telephone: (312) 346-2222
kaw@wbe-llp.com
jnb@wbe-llp.com
mjm@wbe-llp.com

Daniel E. Gustafson
Daniel C. Hedlund
Amanda M. Williams
Kaitlyn L. Dennis
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
awilliams@gustafsongluek.com
kdennis@gustafsongluek.com

Dianne M. Nast
Daniel N. Gallucci
Michael S. Tarringer
Michele S. Burkholder
**NASTLAW LLC**

1101 Market Street, Suite 2801
Philadelphia, PA 19107
Tel: (215) 923-9300
dnast@nastlaw.com
dgallucci@nastlaw.com
mtarringer@nastlaw.com
mburkholder@nastlaw.com


Kevin Landau
Miles Greaves
Evan Rosin
**TAUS, CEBULASH & LANDAU, LLP**
123 Williams St., Suite 1900A
New York, NY 10038
Telephone: (646) 873-7654
klandau@tcllaw.com
atamoshunas@tcllaw.com
mgreaves@tcllaw.com

Simon Bahne Paris
Patrick Howard
**SALTZ, MONGELUZZI,**
**& BENDESKY, P.C.**
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Tel:(215) 575-3986
sparis@smbb.com
phoward@smbb.com

David M. Cialkowski (IL Bar #6255747)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 S. 8th St.
Minneapolis, MN 55402
Tel: (612) 341-0400
david.cialkowski@zimmreed.com

Arthur N. Bailey
Marco Cercone
**RUPP PFALZGRAF, LLC**
1600 Liberty Building

424 Main Street
Buffalo, NY 14202
Telephone: (716) 854-3400
bailey@RuppPfalzgraf.com
cercone@RuppPfalzgraf.com

*Attorneys for Plaintiff*